# EXHIBIT A

PEACHCOURT

| | | | |
|---|---|---|---|
| **2026-SU-V-0228** | **MASON PARK PROPERTIES, LLC V MOUNT VERNON FIRE INSURANCE COMPANY, A...** | **BUTTS SUPERIOR** | **OTHER GENERAL CIVIL** |

## Case Information

Case Initiation Date
05/11/2026

Assigned Judge
THOMAS WILSON

Why subscribe to PeachCourt+? Well, for one thing... you could get an automagic email alert when anyone files anything into this case. You don't have to come back here day after day after day just to check the docket. We'll take care of that for you. All you have to do is subscribe!

## Party Information

Plaintiff:

**MASON PARK PROPERTIES, LLC,**

Defendants:

**MOUNT VERNON FIRE INSURANCE COMPANY, A FOREIGN CORPORATION,**

**UNITED STATES LIABILITY INSURANCE COMPANY, A FOREIGN CORPORATION,**

## Attorney/Filer Information

**O'NEAL, JOHN**

Add to Cart

| Docket # | Document Type | Description | Filer | Filing Date | Source | ☐ |
|---|---|---|---|---|---|---|
| 1 | Complaint | COMPLAINT | O'Neal, John | 05/11/2026 | EFile: PeachCourt | ☐ |
| 2 | Summons | SUMMONS | O'Neal, John | 05/11/2026 | EFile: PeachCourt | ☐ |
| 3 | Summons | SUMMONS | O'Neal, John | 05/11/2026 | EFile: PeachCourt | ☐ |
| 4 | Case Information Form | CIVIL CASE INITIATION FORM | O'Neal, John | 05/11/2026 | EFile: PeachCourt | ☐ |
| 5 | Leave Of Absence | NOTICE OF LEAVE OF ABSENCE | O'Neal, John | 06/02/2026 | EFile: PeachCourt | ☐ |
| 6 | Sheriff's Return Of Service | SHERIFFS RETURN OF SERVICE | O'Neal, John | 06/11/2026 | EFile: PeachCourt | ☐ |
| 7 | Leave Of Absence | NOTICE OF LEAVE OF ABSENCE | O'Neal, John | 06/16/2026 | EFile: PeachCourt | ☐ |

The clerk's office maintains the official record for this case. The information we provide is our best attempt at reflecting the official record. Despite our best efforts, you may find discrepancies between the information on this page and the clerk's official record. The clerk's official record is always official and is always THE record.

PeachCourt - Civil Case Information

Printed from www.peachcourt.com on Jul 2, 2026 2:14 PM

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
BUTTS COUNTY, GEORGIA
2026-SU-V-0228
THOMAS WILSON
MAY 11, 2026 04:57 PM
Morgan V. Ward
Morgan V. Ward, Clerk
Butts County, Georgia

**IN THE SUPERIOR COURT OF BUTTS COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **MASON PARK PROPERTIES, LLC**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**MOUNT VERNON FIRE INSURANCE COMPANY, a foreign corporation, and UNITED STATES LIABILITY INSURANCE COMPANY a Foreign Corporation**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CIVIL ACTION FILE NO.:** |

## COMPLAINT

Comes now Plaintiff MASON PARK PROPERTIES, LLC (hereinafter "Plaintiff"), by and through the undersigned counsel, and files this complaint against MOUNT VERNON FIRE INSURANCE COMPANY and UNITED STATES LIABILITY INSURANCE COMPANY (hereinafter "Defendants") for breach of contract and in support of Plaintiff's claim(s), Plaintiff would further show this court the following:

## PARTIES, JURISDICTION, AND VENUE

1.

Plaintiff is a domestic limited liability corporation, registered to do business in state of Georgia, with a principal address located at 1789 E. Gate Dr., Stone Mountain, GA 30087.

2.

Defendant Mount Vernon Fire Insurance Company (hereinafter "Mount Vernon") is a foreign corporation, registered to do business in the state of Nebraska and can be served via its

Registered Agent Heather Veik at the address 10330 Regency Drive, Suite 100, Omaha, NE 68114.

3.

Defendant United States Liability Insurance Company (hereinafter "USLI") is foreign corporation registered to do business in the state of Georgia, and can be served through its registered agent, John Bonnie, at 3344 Peachtree Road, Suite #2400, Atlanta, Georgia 30326. USLI is a proper party to this complaint as USLI is the parent company and/or corporate owner of co-Defendant Mount Vernon.

4.

This Court has subject matter jurisdiction over this action pursuant to O.C.G.A. § 15- 6-8. The Court has personal jurisdiction over the Defendants pursuant to O.C.G.A. § 9-10-91 because: 1) the Defendant conducts business in the State of Georgia by insuring properties in the State of Georgia, including insuring the property in question, and 2) Defendant USLI has purposefully availed itself of a registered agent with the Secretary of State for service of process in Georgia pursuant to O.C.G.A. § 33-4-1 and O.C.G.A. § 33-4-4.

5.

Venue is proper in this Court because Defendants have insured a property in Butts County, Georgia and, Georgia where the cause of action arose pursuant O.C.G.A. § 14-2-510.

6.

As such, the Parties are subject to the jurisdiction of this Court, this Court has subject matter jurisdiction over the claims set forth herein, and venue is proper in this Court as the property which is the subject of this complaint is located in Butts County, Georgia.

## STATEMENT OF FACTS

7.

At all times relevant to the subject of this lawsuit, Plaintiff was the owner of a commercial building located at 10 Third Street, Jackson, Butts County, Georgia, 30233 (hereinafter the "Property" or "Subject Property").

8.

Plaintiff at all relevant times retained lawful ownership and the immediate right to possession of the Subject Property.

9.

While Plaintiff owned the Subject Property, the Plaintiff purchased from Defendant Mount Vernon Policy Number CP 2659667B (hereinafter "Policy") to insure the Subject Property from damage from (among other, additional causes) wind. More specifically, the Subject Property was insured by said policy during the policy period from August 11, 2024 through August 11, 2025. A copy of the Policy is hereto attached as Exhibit "A".

10.

Accordingly, under the terms of the Policy, the Defendants agreed to provide insurance coverage to the Insured's property against sudden and accidental direct physical loss.

11.

On September 27, 2024, the Subject Property sustained significant damage as a result of being hit by Hurricane Helene, which moved through Butts County, Georgia, and directly impacted downtown Jackson, Georgia – where the Subject Property is located (hereinafter "Loss").

12.

Approximately two months after Hurricane Helene moved through Jackson, Plaintiff was made aware of cracks in the mortar and bowing of the brick veneer on the Subject Property. Plaintiff then engaged the services of Garry D. Kornegay, a structural engineer, to determine the cause of the damage. Upon a thorough inspection of the Property, determined that in his opinions as a structural engineer, that the structural damage to the brick veneer was caused by the negative wind pressure generated from Hurricane Helene. A copy of Garry Kornegay's report is hereto attached as Exhibit "B".

13.

Upon receiving the structural engineer's findings, Plaintiff promptly reported to Defendant Mount Vernon the damage on December 16, 2024. As a result, the Defendants assigned Claim Number . 0-48291 to the Loss and assigned Defendant USLI agent Bob Pace to investigate the Plaintiff's claim for damage. Mr. Pace was authorized as the Insurance Company's representative and agent for the purposes of the Loss.

14.

At all times material hereto, the Plaintiff fully cooperated and the Property was made available to the Insurance Company and its representatives to inspect and investigate the Loss.

15.

Defendants, through its authorized representative and agent, retained an independent adjustment firm, Tenco Services, which in turn, hired Carmelo Gorrido of Rimkus Consulting Group, an engineer, to conduct a separate inspection of the Subject Property.

16.

Upon inspection, Mr. Garrido concluded that Hurricane Helene's winds did not cause the

structural damage to the Property's brick veneers, but rather that the damage was caused by the long term loadings on the structure.

17.

Based primarily (if not solely) on Mr. Garrido's opinion, Agent Bob Pace denied coverage to the Subject Property and Plaintiff. A copy of Mr. Pace's letter denying coverage is hereto attached as Exhibit "C".

18.

As a result, Plaintiff was forced to pay out of pocket for the repairs to the Subject Property's wind damaged veneer, which included complete removal and replacement of the veneer by hand. The total cost for the repairs incurred by the Plaintiff was $151,469.61.

19.

Plaintiff also retained a second engineer, Mr. George Runkle, to review the findings of Engineers Kornegay and Garrido. Mr. Runkle inspected the Subject Property, as well as reviewed photos of the Property prior to any damage and after the removal of the original brick veneer.

20.

Mr. Runkle discovered the original brick veneer wall was undamaged and plumb prior to Hurricane Helene, and that the underlying load bearing wall was also still plumb after Helene.

21.

Mr. Runkle determined that the damage to the veneer aligned with patterns of wind damage to similar structures/walls documented by the Federal Emergency Management Agency. As such, Mr. Runkle concluded that the findings of Mr. Kornegay were accurate, and that the winds of Hurricane Helene caused the damage to the Subject Property. A copy of Mr. Runkle's report is hereto attached as Exhibit "D."

22.

Plaintiff upon receiving the results of Mr. Runkle's report, issued a written demand pursuant to O.C.G.A. § 33-4-6 to Defendants dated October 15, 2024. Plaintiff demanded that the Loss and damage to the Subject Property be properly adjusted, and for payment to Plaintiff for the repairs Plaintiff made in the amount of $103,469.61 – which equals the total costs of repair ($151,469.61) minus 2% deductible required under the Policy. A copy of the demand is hereto attached as Exhibit "E".

23.

Defendants answered Plaintiff's demand on December 15, 2025, again denying coverage of the Loss to the Subject Property based on the findings of Mr. Garrido. Despite the findings of two separate engineers, Defendants still refused to honor Plaintiff's claims and denied coverage to the Subject Property and Plaintiff under the Policy. A copy of the second denial is hereto attached as Exhibit "F".

24.

Plaintiff sent a second, and final demand for Defendants to honor the Policy, to properly adjust the Loss, and to pay the $103,469.61 incurred by Plaintiff to repair for wind damages to the Subject Property; said damage which should have been covered under the terms of the Policy. A copy of the second demand is hereto attached as Exhibit "G".

25.

On April 3, 2026, Defendants responded to Plaintiff's second demand, again denying coverage and the Loss for/to the Subject Property. A copy of Defendants' response to Plaintiff's second demand is hereto attached as Exhibit "H".

## COUNT I – BREACH OF CONTRACT

26.

Plaintiff incorporates the foregoing Paragraphs 1-25 as if fully set forth herein.

27.

At all times material hereto, Plaintiff has satisfied all post-loss obligations to the best of their ability in accordance with the Policy. This includes but is not limited to timely payment of premiums; timely notice of the claim; and protecting the Property from further damage.

28.

Defendants are required to compensate Plaintiff for all direct physical losses caused by wind damages under the terms of the Policy, including the aforementioned costs of repair, minus two percent (2%) deductible, $103,469.61.

29.

Despite Plaintiff's timely written demands that the Defendants pay the covered Loss, the Defendants have frivolously and baselessly failed to adequately provide, and have otherwise denied, coverage under the terms of the Policy. As a result of the foregoing, Defendants have breached the Policy.

30.

Further, Defendants have failed to act in good faith and fair dealing under the terms of the Policy by refusing to properly investigate and pay the Loss according to the terms of the Policy.

31.

There exists a genuine, justifiable controversy between the Plaintiff and Defendants as to whether Defendants are responsible for coverage for the replacement cost of the actual physical damage to the Property caused by the Loss. Plaintiff has exhausted all reasonable means possible

to resolve this dispute with the Defendants. With no other option, the Plaintiff was constrained to hire legal counsel, incurring additional expenses, and filing this lawsuit.

**COUNT II – RECOVERY OF INTEREST UPON DAMAGES (O.C.G.A. § 13-6-13)**

32.

Plaintiff reincorporates the foregoing Paragraphs 1-31 as if fully set forth herein.

33.

Pursuant to O.C.G.A. § 13-6-13, Plaintiff is entitled to, and Defendants liable for, interest upon Plaintiff's damages sustained as a result of Defendant's breach of contract described herein.

**COUNT III - BAD FAITH DAMAGES AND ATTORNEY'S FEES (O.C.G.A. § 33-4-6)**

34.

Plaintiff reincorporates the foregoing Paragraphs 1-33 as if fully set forth herein.

35.

Defendants have refused to fully compensate Plaintiff for damages resulting from the Loss, and in doing so have acted in bad faith.

36.

Defendant failed to fully compensate Plaintiff for damage resulting from the Loss despite being provided with ample evidence demonstrating that the damages were covered under the terms and conditions of the Policy.

37.

More than 60 days prior to filing the instant lawsuit, Plaintiff sent to Defendants a demand for payment and Defendants refused to pay said demand. Copies of the pre-suit demands are incorporated herein by reference, and hereto attached as composite Exhibit "D".

38.

Plaintiff is entitled to recovery of bad faith damages, as well as attorney's fees and expenses of litigation, pursuant to Defendants` bad faith conduct.

**ATTORNEYS' FEES AND EXPENSES (O.C.G.A. § 13-6-11)**

39.

Plaintiff reincorporates the foregoing Paragraphs 1-38 as if full set forth herein.

40.

As stated, Defendants have acted in bad faith, have been stubbornly litigious, and have caused Plaintiff unnecessary trouble and expense, by refusing to provide coverage according to the provisions of the valid contract for insurance provided by the Policy, as well as, refusing when presented with evidence from two separate expert engineers, to admit that damages to the Subject Property, were caused by wind damage from Hurricane Helene, and thus covered by a plain reading of the Policy. This bad faith, stubborn litigiousness has caused Plaintiff the unnecessary trouble and expense of hiring an attorney and filing suit.

41.

Plaintiff is entitled to recover reasonable attorneys` fees and litigation expenses pursuant to O.C.G.A. § 13-6-11.

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury of all issues triable as a matter of right.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that the Court:

(a) grant Judgement in favor of Plaintiff;

(b) Award an amount to be determined at trial to the Plaintiff and against Defendants for breach of contract;

(c) Award bad faith damages and attorneys fees pursuant to O.C.G.A. § 33-4-6;

(d) Award attorneys` fees and expenses pursuant to O.C.G.A. § 13-6-11;

(e) Award Plaintiff against Defendant for interest upon the Plaintiff's damages pursuant to O.C.G.A.§ 13-6-13;

(f) Award to Plaintiff against Defendant any other costs of litigation;

(g) Grant such other and further relief as the Court deems just and proper in law or equity.

Respectfully submitted this 11th day of May, 2026.

**BECK, OWEN & MURRAY**
Attorneys for Plaintiff

John T. O'Neal
Georgia State Bar No. 822618
David E. Penland
Georgia State Bar No. 636376

One Griffin Center—Suite 600
100 South Hill Street
Griffin, Georgia 30223
Phone: (770) 227-4000
Fax: (770) 229-8524
Email: joneal@beckowen.com

# EXHIBIT "A"

Copy of Mason Park Insurance Policy for Subject Property

USLI

USLI.COM
888-523-5545

# Note About Loss Control

Dear Valued Policyholder,

Slips, trips and falls are among the most frequent causes of loss. What might surprise you is that, many times, they result in claims and judgments in the hundreds of thousands of dollars, which ultimately impact your insurance premium. In most instances, these claims can be lessened or prevented entirely simply by addressing the most common causes of such losses listed below.

## Most Common Causes

- Spills, wet or icy walking surfaces
- Uneven or worn floors/carpets/steps/sidewalks
- Inadequate or poorly maintained lighting
- Obstructed views
- Poor housekeeping - Excess clutter/trash in walkways or near open flames or hot surfaces

We encourage you to please take the time to periodically inspect your premises to see if any of these conditions exist and work to eliminate them where possible. Your efforts may save you money on future insurance premiums and, quite possibly, save your business.

Thank you for choosing and trusting us to help protect your business!

*"An ounce of prevention is worth a pound of cure."*
*-Benjamin Franklin*

Regards,

Thomas P. Nerney
Chairman, President and CEO

CP 2659667A
Renewal of Number

**POLICY DECLARATIONS**

**No. CP 2659667B**

# Mount Vernon Fire Insurance Company

**1190 Devon Park Drive, Wayne, Pennsylvania 19087**
A Member Company of United States Liability Insurance Group

This contract is registered and delivered as a surplus line coverage under the Surplus Line Insurance Law, O.C.G.A. Chapter 33-5.

NAMED INSURED AND ADDRESS:
**MASON PARK PROPERTIES LLC**
**10 3RD STREET**
**JACKSON, GA 30233**

POLICY PERIOD: (MO. DAY YR.) From: 08/11/2024 To: 08/11/2025 — 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE

FORM OF BUSINESS: Limited Liability Company

BUSINESS DESCRIPTION: Lessors Risk Only

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | PREMIUM |
|---|---|
| Commercial Liability Coverage Part | $1,013.00 |
| Commercial Property Coverage Part | $7,241.00 |
| Wholesaler Broker Fee | $150.00 |
| Surplus Lines Tax | $336.16 |
| **TOTAL:** | **$8,740.16** |

This contract is registered and delivered as a surplus line coverage under the Surplus Line Insurance Law, O.C.G.A. Chapter 33-5.

Adam Walsh Devine, Lic. #3026634

Coverage Form(s) and Endorsement(s) made a part of this policy at time of issue

**See Endorsement EOD (1/95)**

Agent: **XS BROKERS INSURANCE AGENCY, INC. (1711)**
**13 Temple Street**
**Quincy, MA 02169**

Issued: **08/14/2024 11:36 AM**

Broker: Southern States Insurance Inc
3130 Golf Ridge Blvd Ste 200
Douglasville, GA 30135

By: Thomas P. Kennedy
Authorized Representative

**THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.**

# EXTENSION OF DECLARATIONS

**Policy No. CP 2659667B**

Effective Date: **08/11/2024**
12:01 AM STANDARD TIME AT YOUR MAILING ADDRESS

## FORMS AND ENDORSEMENTS

**The following forms apply to multiple coverage parts**

| *Endt#* | *Revised* | *Description of Endorsements* |
|---|---|---|
| 2110 | 04/15 | Service Of Suit |
| IL0017 | 11/98 | Common Policy Conditions |
| IL0021 | 09/08 | Nuclear Energy Liability Exclusion Endorsement |
| IL0262 | 02/15 | Georgia Changes - Cancellation And Nonrenewal |
| IL0935 | 07/02 | Exclusion Of Certain Computer-Related Losses |
| Jacket | 07/19 | Policy Jacket |
| L-367 | 04/15 | Minimum Earned Premium Endorsement |
| L-526 | 01/15 | Absolute War Or Terrorism Exclusion |
| L-610 | 11/04 | Expanded Definition Of Bodily Injury |
| P 249 | 01/15 | Exclusion of War, Military Action and Terrorism (Coverage for Certain Fire Losses) |
| TRIADN | 12/20 | Disclosure Notice of Terrorism Insurance Coverage |

**The following forms apply to the Commercial Liability coverage part**

| *Endt#* | *Revised* | *Description of Endorsements* |
|---|---|---|
| CG 21 06 | 12/23 | EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL MATERIAL OR INFORMATION |
| CG0001 | 12/07 | Commercial General Liability Coverage Form |
| CG0068 | 05/09 | Recording And Distribution Of Material Or Information In Violation Of Law Exclusion |
| CG2109 | 06/15 | Exclusion - Unmanned Aircraft |
| CG2136 | 03/05 | Exclusion - New Entities |
| CG2139 | 10/93 | Contractual Liability Limitation |
| CG2144 | 04/17 | Limitation of Coverage to Designated Premises, Project or Operation |
| CG2147 | 12/07 | Employment-Related Practices Exclusion |
| CG4032 | 05/23 | Exclusion - Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) |
| IL0262 | 02/15 | Georgia Changes - Cancellation And Nonrenewal |
| L-232s | 09/05 | Classification Limitation Endorsement |
| L-428 | 11/20 | Absolute Firearms Exclusion |
| L-461 | 11/20 | Absolute Assault or Battery Exclusion |
| L-526 | 01/15 | Absolute War Or Terrorism Exclusion |
| L-599 | 04/15 | Absolute Exclusion For Pollution, Organic Pathogen, Silica, Asbestos And Lead With A Hostile Fire Exception |
| L-783 | 04/15 | Amendment Of Liquor Liability Exclusion |
| LLQ100 | 04/15 | Who Is An Insured Clarification Endorsement |
| LLQ368 | 04/15 | Separation Of Insureds Clarification Endorsement |

**The following forms apply to the Commercial Property coverage part**

| *Endt#* | *Revised* | *Description of Endorsements* |
|---|---|---|

# EXTENSION OF DECLARATIONS

**Policy No. CP 2659667B**

Effective Date: **08/11/2024**

12:01 AM STANDARD TIME AT YOUR MAILING ADDRESS

**FORMS AND ENDORSEMENTS**

| | | |
|---|---|---|
| CP 101 | 04/15 | Maintenance Of Heat Condition |
| CP 109 GA | 12/14 | Functional Building Valuation |
| CP 117 | 04/15 | Multiple Deductible Form |
| CP 141 DEP | 04/20 | Changes - Actual Cash Value and Depreciation Definition |
| CP 142 | 04/14 | Protective Devices Or Services Provisions |
| CP 224 | 10/21 | Asbestos Material Exclusion |
| CP 225 | 04/15 | Exclusion - Lead Contamination |
| CP 226 | 04/15 | Absolute Pollution Exclusion – Property |
| CP 227 | 02/11 | Mold, Fungus, Bacteria, Virus Or Organic Pathogen Exclusion |
| CP 245 | 09/15 | Earth Movement Exclusion |
| CP0010 | 06/07 | Building And Personal Property Coverage Form |
| CP0030 | 06/07 | Business Income (And Extra Expense) Coverage Form |
| CP0090 | 07/88 | Commercial Property Conditions |
| CP0321 | 10/12 | Windstorm Or Hail Percentage Deductible |
| CP1030 | 06/07 | Causes Of Loss - Special Form |
| CP1032 | 08/08 | Water Exclusion Endorsement |
| CP1075 | 12/20 | Cyber Incident Exclusion |
| IL0262 | 02/15 | Georgia Changes - Cancellation And Nonrenewal |
| P 249 | 01/15 | Exclusion of War, Military Action and Terrorism (Coverage for Certain Fire Losses) |

# COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

**Policy No. CP 2659667B**

Effective Date: 08/11/2024
12:01 STANDARD TIME

## DESCRIPTION OF PREMISES

| Prem | Bldg | Location, Construction, Occupancy and Other Information | | Territory | Fire Code |
|---|---|---|---|---|---|
| 1 | 1 | **10 Third St, Jackson, GA 30233** | | **003** | **0567** |
| | | Description: **Lessors Risk Only** | | | |
| | | Covered Causes of Loss: **Special** | | Protection Class | **4** |
| | | Construction: **Joisted Masonry** | | Square Footage: | **13800** |
| | | Special Deductible: **2%** | Special Deductible Type: **Wind and Hail** | | |

## COVERAGES PROVIDED - INSURANCE AT THE DESCRIBED PREMISES APPLIES ONLY FOR COVERAGES FOR WHICH A LIMIT OF INSURANCE IS SHOWN

| Prem | Bldg | Coverage | Limits of Insurance | Deductible | Coinsurance % or Monthly Indemnity | + Valuation | Premium |
|---|---|---|---|---|---|---|---|
| 1 | 1 | Building | $2,415,000 | $5,000 | 80% | FBV | $7,028 |
| 1 | 1 | Business Income with Extra Expense | $77,000 | $0 | 100% | | $213 |

**MINIMUM PREMIUM FOR PROPERTY COVERAGE PART: $250**

**TOTAL PREMIUM FOR PROPERTY COVERAGE PART: $7,241**

**MP - minimum premium**

**+ Valuation: ACV - Actual Cash Value; RC - Replacement Cost; RC/ACV - Replacement Cost/ACV Roof**
**FBV - Functional Building Value; AA - Agreed Amount; ALS - Actual Loss Sustained**

**LOSS PAYABLE(S): NONE**

Coverage Form(s)/Part(s) and Endorsement(s) made a part of this policy at time of issue:

**See Endorsement EOD (01/95)**

**THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**


Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.
Copyright, ISO Commercial Risk Services, Inc., 1983, 1984, 1988

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

**Policy No.** **CP 2659667B**

Effective Date: 08/11/2024
12:01 STANDARD TIME

**LIMITS OF INSURANCE**

| | |
|---|---|
| Each Occurrence Limit | **$1,000,000** |
| Personal & Advertising Injury Limit (Any One Person/Organization) | **$1,000,000** |
| Medical Expense (Any One Person) | **$5,000** |
| Damages To Premises Rented To You (Any One Premises) | **$100,000** |
| Products/Completed Operations Aggregate Limit | **Included** |
| General Aggregate Limit | **$2,000,000** |

**LIABILITY DEDUCTIBLE** **$0**

**LOCATIONS OF ALL PREMISES YOU OWN, RENT OR OCCUPY**

| *Location* | *Address* | *Territory* |
|---|---|---|
| 1 | 10 Third St, Jackson, GA 30233 | 003 |

**PREMIUM COMPUTATION**

| *Loc* | *Classification* | *Code No.* | *Premium Basis* | *Rate* *Pr/Co* | *Rate* *All Other* | *Advance Premium* *Pr/Co* | *Advance Premium* *All Other* |
|---|---|---|---|---|---|---|---|
| 1 | Buildings or Premises - Mercantile (lessor's risk only) | 61217 | 13,800 Per 1,000 Total Area | Included | 73.422 | Included | $1,013 |

**MINIMUM PREMIUM FOR GENERAL LIABILITY COVERAGE PART:** **$500**

**TOTAL PREMIUM FOR GENERAL LIABILITY COVERAGE PART:** **$1,013**

(This Premium may be subject to adjustment.) **MP - minimum premium**

Coverage Form(s)/Part(s) and Endorsement(s) made a part of this policy at time of issue:

**See Form EOD (01/95)**

**THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.
Copyright, ISO Commercial Risk Services, Inc., 1983, 1984, 1988

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **H.**, Definitions.

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1. Covered Property**

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire-extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property – Separation Of Coverage form:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

 © ISO Properties, Inc., 2007 

c. **Personal Property Of Others** that is:

(1) In your care, custody or control; and

(2) Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

2. **Property Not Covered**

Covered Property does not include:

a. Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

b. Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

c. Automobiles held for sale;

d. Bridges, roadways, walks, patios or other paved surfaces;

e. Contraband, or property in the course of illegal transportation or trade;

f. The cost of excavations, grading, backfilling or filling;

g. Foundations of buildings, structures, machinery or boilers if their foundations are below:

(1) The lowest basement floor; or

(2) The surface of the ground, if there is no basement;

h. Land (including land on which the property is located), water, growing crops or lawns;

i. Personal property while airborne or waterborne;

j. Bulkheads, pilings, piers, wharves or docks;

k. Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

l. Retaining walls that are not part of a building;

m. Underground pipes, flues or drains;

n. Electronic data, except as provided under the Additional Coverage, Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This paragraph, **n.**, does not apply to your "stock" of prepackaged software;

o. The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

p. Vehicles or self-propelled machines (including aircraft or watercraft) that:

(1) Are licensed for use on public roads; or

(2) Are operated principally away from the described premises.

This paragraph does not apply to:

(a) Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

(b) Vehicles or self-propelled machines, other than autos, you hold for sale;

(c) Rowboats or canoes out of water at the described premises; or

(d) Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers;


© ISO Properties, Inc., 2007

**q.** The following property while outside of buildings:

**(1)** Grain, hay, straw or other crops;

**(2)** Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than "stock" of trees, shrubs or plants), all except as provided in the Coverage Extensions.

**3. Covered Causes Of Loss**

See applicable Causes Of Loss Form as shown in the Declarations.

**4. Additional Coverages**

**a. Debris Removal**

**(1)** Subject to Paragraphs **(3)** and **(4),** we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

**(2)** Debris Removal does not apply to costs to:

**(a)** Extract "pollutants" from land or water; or

**(b)** Remove, restore or replace polluted land or water.

**(3)** Subject to the exceptions in Paragraph **(4),** the following provisions apply:

**(a)** The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

**(b)** Subject to **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

**(4)** We will pay up to an additional $10,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

**(a)** The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

**(b)** The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if **(4)(a)** and/or **(4)(b)** apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $10,000.

**(5) Examples**

The following examples assume that there is no Coinsurance penalty.

**EXAMPLE #1**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 50,000 |
| Amount of Loss Payable: | $ 49,500 |
| | ($50,000 – $500) |
| Debris Removal Expense: | $ 10,000 |
| Debris Removal Expense Payable: | $ 10,000 |

($10,000 is 20% of $50,000.)

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3).**

**EXAMPLE #2**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 80,000 |
| Amount of Loss Payable: | $ 79,500 |
| | ($80,000 – $500) |
| Debris Removal Expense: | $ 30,000 |
| Debris Removal Expense Payable | |
| Basic Amount: | $ 10,500 |
| Additional Amount: | $ 10,000 |


© ISO Properties, Inc., 2007

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($30,000) exceeds 25% of the loss payable plus the deductible ($30,000 is 37.5% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $30,000 = $109,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $10,000, the maximum payable under Paragraph **(4)**. Thus the total payable for debris removal expense in this example is $20,500; $9,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000, unless a higher limit is shown in the Declarations, for your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**e. Increased Cost Of Construction**

**(1)** This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in **e.(3)** through **e.(9)** of this Additional Coverage.

**(3)** The ordinance or law referred to in **e.(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.


© ISO Properties, Inc., 2007

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

**(a)** You were required to comply with before the loss, even when the building was undamaged; and

**(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

**(a)** The enforcement of any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**(b)** Any costs associated with the enforcement of an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of: $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

**(a)** We will not pay for the Increased Cost of Construction:

**(i)** Until the property is actually repaired or replaced, at the same or another premises; and

**(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the same premises.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion, to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

**(9)** The costs addressed in the Loss Payment and Valuation Conditions, and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of an ordinance or law. The amount payable under this Additional Coverage, as stated in **e.(6)** of this Additional Coverage, is not subject to such limitation.

**f. Electronic Data**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

 © ISO Properties, Inc., 2007 

**(3)** The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

**(a)** If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

**(b)** If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage, Electronic Data, includes Collapse as set forth in that form.

**(c)** If the Causes Of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

**(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

**(4)** The most we will pay under this Additional Coverage, Electronic Data, is $2,500 for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired Or Constructed Property**

**(1) Buildings**

If this policy covers Building, you may extend that insurance to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at locations, other than the described premises, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2) Your Business Personal Property**

**(a)** If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

**(i)** Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions;

**(ii)** Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations; or

**(iii)** Business personal property that you newly acquire, located at the described premises.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

 © ISO Properties, Inc., 2007 

**(b)** This Extension does not apply to:

**(i)** Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

**(ii)** Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**

With respect to insurance on or at each newly acquired or constructed property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** If the Causes Of Loss – Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

**(3)** If the Causes Of Loss – Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist), and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and therefore coverage of such costs is not additional insurance.

**d. Property Off-premises**

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

**(a)** Temporarily at a location you do not own, lease or operate;

**(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

**(c)** At any fair, trade show or exhibition.


© ISO Properties, Inc., 2007

(2) This Extension does not apply to property:

(a) In or on a vehicle; or

(b) In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

(3) The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than "stock" of trees, shrubs or plants), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

(1) Fire;

(2) Lightning;

(3) Explosion;

(4) Riot or Civil Commotion; or

(5) Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

**f. Non-owned Detached Trailers**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

(a) The trailer is used in your business;

(b) The trailer is in your care, custody or control at the premises described in the Declarations; and

(c) You have a contractual responsibility to pay for loss or damage to the trailer.

(2) We will not pay for any loss or damage that occurs:

(a) While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

(b) During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

(3) The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

(4) This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss Form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to a building, is $2,500 per sign in any one occurrence.

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) of Insurance shown in the Declarations for any other coverage:

1. Fire Department Service Charge;
2. Pollutant Clean-up And Removal;
3. Increased Cost Of Construction; and
4. Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.


© ISO Properties, Inc., 2007

**D. Deductible**

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss, and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**EXAMPLE #1**

(This example assumes there is no Coinsurance penalty.)

| | |
|---|---|
| Deductible: | $ 250 |
| Limit of Insurance – Building #1: | $ 60,000 |
| Limit of Insurance – Building #2: | $ 80,000 |
| Loss to Building #1: | $ 60,100 |
| Loss to Building #2: | $ 90,000 |

The amount of loss to Building #1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building #1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building #1:

$ 60,100
– 250
$ 59,850 Loss Payable – Building #1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building #2. Loss payable for Building #2 is the Limit of Insurance of $80,000.

Total amount of loss payable:

$59,850 + $80,000 = $139,850

**EXAMPLE #2**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example #1.

| | |
|---|---|
| Loss to Building #1: | $ 70,000 |
| (Exceeds Limit of Insurance plus Deductible) | |
| Loss to Building #2: | $ 90,000 |
| (Exceeds Limit of Insurance plus Deductible) | |
| Loss Payable – Building #1: | $ 60,000 |
| (Limit of Insurance) | |
| Loss Payable – Building #2: | $ 80,000 |
| (Limit of Insurance) | |
| Total amount of loss payable: | $ 140,000 |

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.


© ISO Properties, Inc., 2007

**3. Duties In The Event Of Loss Or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.


© ISO Properties, Inc., 2007

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

**a. Description Of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**(i)** Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

**(ii)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

**(1)** We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

**(a)** Vandalism;

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

**(2)** With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

**a.** At actual cash value as of the time of loss or damage, except as provided in **b., c., d.** and **e.** below.

**b.** If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

 © ISO Properties, Inc., 2007 

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value even when attached to the building:

**(1)** Awnings or floor coverings;

**(2)** Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

**(3)** Outdoor equipment or furniture.

**c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

**d.** Glass at the cost of replacement with safety-glazing material if required by law.

**e.** Tenants' Improvements and Betterments at:

**(1)** Actual cash value of the lost or damaged property if you make repairs promptly.

**(2)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(a)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(3)** Nothing if others pay for repairs or replacement.

**F. Additional Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in Step **(1)**;

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step **(2)**; and

**(4)** Subtract the deductible from the figure determined in Step **(3)**.

We will pay the amount determined in Step **(4)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**EXAMPLE #1 (UNDERINSURANCE)**

| | | |
|---|---|---|
| When: | The value of the property is: | $ 250,000 |
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $ 100,000 |
| | The Deductible is: | $ 250 |
| | The amount of loss is: | $ 40,000 |
| Step **(1)**: | $250,000 x 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements) | |
| Step **(2)**: | $100,000 ÷ $200,000 = .50 | |
| Step **(3)**: | $40,000 x .50 = $20,000 | |
| Step **(4)**: | $20,000 – $250 = $19,750 | |

We will pay no more than $19,750. The remaining $20,250 is not covered.

 © ISO Properties, Inc., 2007 

**EXAMPLE #2 (ADEQUATE INSURANCE)**

| | | |
|---|---|---|
| When: | The value of the property is: | $ 250,000 |
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $ 200,000 |
| | The Deductible is: | $ 250 |
| | The amount of loss is: | $ 40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**EXAMPLE #3**

| | | |
|---|---|---|
| When: | The value of the property is: | |
| | Building at Location #1: | $ 75,000 |
| | Building at Location #2: | $ 100,000 |
| | Personal Property at Location #2: | $ 75,000 |
| | | $ 250,000 |
| | The Coinsurance percentage for it is: | 90% |
| | The Limit of Insurance for Buildings and Personal Property at Locations #1 and #2 is: | $ 180,000 |
| | The Deductible is: | $ 1,000 |
| | The amount of loss is: | |
| | Building at Location #2: | $ 30,000 |
| | Personal Property at Location #2: | $ 20,000 |
| | | $ 50,000 |

| | |
|---|---|
| Step **(1)**: | $250,000 x 90% = $225,000 (the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below) |
| Step **(2)**: | $180,000 ÷ $225,000 = .80 |
| Step **(3)**: | $50,000 x .80 = $40,000 |
| Step **(4)**: | $40,000 – $1,000 = $39,000 |

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

**a.** The term mortgageholder includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

 © ISO Properties, Inc., 2007 

g. If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

**1. Agreed Value**

a. The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

b. If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

c. The terms of this Optional Coverage apply only to loss or damage that occurs:

(1) On or after the effective date of this Optional Coverage; and

(2) Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2. Inflation Guard**

a. The Limit of Insurance for property to which this Optional Coverage applied will automatically increase by the annual percentage shown in the Declarations.

b. The amount of increase will be:

(1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

(2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

(3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**EXAMPLE**

| | | |
|---|---|---|
| If: | The applicable Limit of Insurance is: | $ 100,000 |
| | The annual percentage increase is: | 8% |
| | The number of days since the beginning of the policy year (or last policy change) is: | 146 |
| | The amount of increase is: $100,000 x .08 x 146 ÷ 365 = | $ 3,200 |

**3. Replacement Cost**

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

b. This Optional Coverage does not apply to:

(1) Personal property of others;

(2) Contents of a residence;

(3) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

(4) "Stock", unless the Including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

d. We will not pay on a replacement cost basis for any loss or damage:

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.


© ISO Properties, Inc., 2007

With respect to tenants' improvements and betterments, the following also apply:

**(3)** If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

**(4)** We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

**(1)** The Limit of Insurance applicable to the lost or damaged property;

**(2)** The cost to replace the lost or damaged property with other property:

**(a)** Of comparable material and quality; and

**(b)** Used for the same purpose; or

**(3)** The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**4. Extension Of Replacement Cost To Personal Property Of Others**

**a.** If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

**b.** With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

## H. Definitions

1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.
2. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.
3. "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.


© ISO Properties, Inc., 2007

# EXHIBIT "B"

Kornegay Engineering Report

Kornegay Engineering
Structural Consultant
363 Pierce Avenue Suite 202
Macon, GA 31204
(478)745-6161 • keimacon.com

December 16, 2024

Mr. Jeff Denkins
Mason Park Properties, LLC
10 Third Street
Jackson, Georgia

RE: Structural inspection
KEI Project: 24-378

Dear Mr. Denkins:

Kornegay Engineering Inc. performed a visual inspection of the referenced building on November 25, 2024. The purpose of our site visit was to observe the existing conditions and provide our structural recommendations. On the Oak Street elevation of your building, we observed a very obvious bulge in the brick for over half of the elevation. We observed that there was no bulge in the wall on the inside of the building. The exterior layer of brick appeared to be an addition to the original brick wall that was 3 to 4 courses thick depending on which floor. The color of the new brick and mortar was different than the other exterior bricks. We were told that some signs were removed from the wall approximately 3 months ago, which would have been in August, and no problems with the wall were reported. On September 27 this area was affected by Hurricane Helene but probably did not have hurricane strength winds. But these winds were probably stronger than this area has had in a long period of time. It is our professional opinion that the bulge was caused by the negative wind pressure from the storm. We did not observe any signs of other causes, such as water intrusion. The shape of the bulge appeared to indicate that there were very few or no brick ties attaching the veneer to the original brick wall. We recommend that the wall be temporarily shored as shown in the attached drawing. After the shoring has been completed then remove the brick layer starting at the top and progress down. See the attached drawing that indicates how to tie the new brick veneer to the original wall.

This report is based on a visual inspection only and is made solely to provide an opinion of the structural problems addressed. The opinions stated in this report are not accompanied by any warranty, either written or implied, except that we used good engineering judgment and used methods commonly accepted as adequate by competent engineers practicing in the State of Georgia. Neither the observations nor this report is intended to cover geotechnical, mechanical, electrical, plumbing, or architectural features.

Should you have any questions, please do not hesitate to call.
Sincerely,

Garry D. Kornegay, P.E.
Georgia Registration No. 11263

GEORGIA REGISTERED No. PE011263 PROFESSIONAL ENGINEER GARRY DAN KORNEGAY

**Kornegay Engineering, Inc.**
Structural Consultant
363 Pierce Avenue
Suite 202
Macon, Ga 31204
Phone: (478) 745-6161
www.keimacon.com

Job: 24-378

Prepared: GK Checked: ______

Date: 12/16/24

Sheet No: 1 Of: 2

10 THIRD ST
JACKSON, GEORIA

GEORGIA REGISTERED No. PE011... PROFESSIONAL ENGINEER GARRY DAN KORNEGAY




TYPICAL SHORING SECTION
1/8" = 1'-0"

KEi

**Kornegay Engineering, Inc.**
**Structural Consultant**
**363 Pierce Avenue**
**Suite 202**
**Macon, Ga 31204**

**Phone: (478) 745-6161**
**www.keimacon.com**

Job: 24-378

Prepared: GK Checked: ______

Date: 12/16/24

Sheet No: 2 Of: 2

10 THIRD STREET
JACKSON, GEORGIA

GEORGIA REGISTERED No. PE011235 PROFESSIONAL ENGINEER GARRY DAN KORNEGAY




NEW VENEER ATTACHMENT
1½" = 1'-0"

# EXHIBIT "C"

Bob Pace Denial Letter of January 21, 2025

USLI

January 21, 2025

Mason Park Properties LLC
10 3rd Street
Jackson, GA 30233
Attn: Jeff Denkins

***Via Email (jdenkins@mindspring.com)***

| | | |
|---|---|---|
| RE: | Claim No.: | 0-48291 |
| | Reported date of loss: | 09/27/2024 |
| | Policyholder: | Mason Park Properties LLC |
| | Policy Number: | CP 26596667B |
| | Policy Effective Dates: | 08/11/2024 - 08/11/2025 |
| | Issuing Company: | Mount Vernon Fire Insurance Company |

Dear Jeff Denkins:

Mount Vernon Fire Insurance Company (the "Company") received notice of the above captioned claim on December 16, 2024 for claimed wind damage at 10 Third St, Jackson, GA 30233 that occurred on or about September 27, 2024. According to the first report, there was possible hurricane damage, with bricks pulling away from the side of the building. Upon receipt, the Company hired the independent adjustment firm Tenco Services Inc. to investigate on its behalf.

We completed our review of this matter and confirmed the adjuster found a large bow in the exterior brick veneer wall on the right building elevation of the insured building. The bow was approximately 20 feet from the ground in the middle of the wall.

You engaged Mr. Garry D Kornegay of Kornegay Engineering to inspect the property. He reported that the bulge in the brick was a result of negative wind pressure from Hurricane Helene. His enclosed December 16, 2024 report also indicated there were few or no ties attaching the outer layer of brick veneer to the original layer and he recommended shoring the wall to stop additional separation. No bulge was found within the interior walls or any sign of water intrusion. Mr. Kornegay completed the enclosed supplemental report dated January 10, 2024, stating that negative pressure would be transferred to the original brick wall as well.

Our Company retained Rimkus Engineering to complete an inspection and provide an analysis on the cause of the damage. We have attached a copy of their report for your review. The assigned engineer, Carmelo A. Garrido, P.E., observed several structural issues with the west wall of the building. Diagonal bracing was installed on about 75% of the wall, but the wall bowed outward significantly at the second-floor level, with a lateral displacement of over six (6) inches. Horizontal cracks were found in the brick masonry on the exterior, filled with debris and cobwebs, starting 15 to 20 feet from the ends of the wall. Inside, the walls were out of plumb and leaning outward, more so on the exterior than the interior. The first-floor gypsum board was cut

to fit this condition. No movement was noted at the joint between the wall and floor above the drop ceiling. Separations were present behind the baseboard and at wall joints on the second floor, with differences in texture at the cracks. The second-floor window had sealant bridging gaps and displacement between the sill and rowlock. The roof membrane was billowing and wrinkling behind the parapet walls. Historical street views showed similar separations at the second-floor windows before Hurricane Helene, with no signage on the wall at that time. Mr. Garrido's conclusions are as follows:

- The outer brick veneer movement at the west wall was not caused by negative pressure on the west elevation resulting from the passage of Hurricane Helene. The outer brick veneer movement was a long-term, pre-existing condition present prior to the passage of Helene.

Coverage for this situation is being sought under policy CP 2659667B (the "Policy") which carries a $2,415,000 limit of insurance for Building subject to a special 2% wind and hail $48,300 per occurrence deductible for damage caused by covered causes of loss, and a $77,000 limit of insurance for Business Income with Extra Expense, subject to a 72-hour waiting period at the premises described in the declarations.

As explained in more detail below, the Policy does not provide for the claimed damage and therefore we respectfully deny your request for payment.

Please refer to policy form **CP 00 10 06 07**, the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM** that states the following in relevant part:

> **A. Coverage**
> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
>
> **1. Covered Property**
> Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.
>
> a. **Building**, meaning the building or structure described in the Declarations…

The preceding language indicates we cover direct physical loss or damage to your insured building if caused by a Covered Cause of Loss.

Please refer to policy form **CP 10 30 06 07**, the **CAUSES OF LOSS – SPECIAL FORM** which states the following in relevant part:

**A. Covered Causes Of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:

**1.** Excluded in Section **B.**, Exclusions; or
**2.** Limited in Section **C.**, Limitations;
that follow.

**B. Exclusions**

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

***

**d. (1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(4)** Settling, cracking, shrinking or expansion;

***

**3.** We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss

***

**c.** Faulty, inadequate or defective:

***

**(3)** Materials used in repair, construction, renovation or remodeling; or
**(4)** Maintenance;

The above referenced policy language indicates a Covered Cause of Loss is a Risk of Direct Physical Loss unless excluded or limited by the Policy. The Policy exclusions eliminate wear and tear; deterioration; cracking; shrinking; expansion; or faulty, inadequate, or defective materials used in repairs, renovations, or remodeling; and maintenance. The wall exhibited horizontal cracks on the exterior with debris and cobwebs and first floor interior drywall was cut to fit the movement within the wall, which occurred prior to the remnants of Hurricane Helene affecting the area.

Please refer to policy form **CP 00 30 06 07**, the **BUSINESS INCOME (AND EXTRA EXPENSE COVERAGE FORM),** that states the following in relevant part:

**A. Coverage**
**1. Business Income**

***

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

The preceding policy language indicates that we pay for loss of Business Income if caused by direct physical loss or damage from a Covered Cause of Loss. Since the damage is caused by the excluded perils of wear and tear and faulty materials used in construction, as detailed by the Rimkus engineer, Business Income coverage is not triggered.

For the reasons stated above, the Policy does not provide coverage for this matter. This determination is based upon all information available to me at this time. If you have additional information or legal authority that you believe may affect the Company's position regarding coverage for this claim, or you obtain such information or authority in the future, I would be happy to review the same at any time. There may be other reasons for which coverage does not exist for this matter, and the failure to enumerate each and every potential ground for a coverage denial does not mean that the Company has waived any rights under the Policy. The Company's

position may be subject to change if additional facts and legal theories are developed and we reserve all of our rights under the Policy.

If you have questions or disagree with the decision communicated in this letter, please contact me via email at robert.pace@usli.com or by phone at 800-523-5545 extension 7602.

Sincerely,

Bob Pace

Bob Pace
Property Examiner

cc (via email):
XS Brokers Insurance Agency, Inc.
gjackman@xsbrokers.com

# EXHIBIT "D"

Runkle Consulting Engineer Report

# Runkle Consulting, Inc

**October 1, 2025**

**Mr. Jeff Denkins**
Mason Park Properties, LLC
10 Third Street
Jackson, GA 30233

Dear Mr. Denkins:

I have completed my review of the report prepared on **December 16, 2024** by Garry D. Kornegay, PE of Kornegay Engineering concerning your property at **10 Third Street, Jackson, GA**. I have also examined the photographs you provided of the wall, taken **prior to Hurricane Helene**, which impacted the building on **September 27, 2024**.

In his report, Mr. Kornegay attributes the observed damage—namely, the exterior layer of brick veneer bowing outward—to **negative pressure from the storm**. He explicitly notes that he **did not observe any other contributing causes**, such as water intrusion.

Conversely, the engineer retained by your insurance provider, **Mr. Carmelo A. Garrido, PE of Rimkus**, asserts that the wind loads experienced during Hurricane Helene were **insufficient to have caused such damage**. He instead attributes the failure to **long-term loadings** on the structure, citing a **CoreLogic Wind Verification Report** which indicates peak wind speeds reached **55 mph** at the site. However, because the CoreLogic methodology is proprietary, its accuracy cannot be independently verified.

From the photographs you supplied, the brick veneer was not bulging on July 22, 2024 when the signage was removed from the brick veneer. After the post storm removal of the brick veneer, the underlying load bearing masonry wall was plumb (straight and vertical) showing no evidence of long-term deflection. Therefore, the exterior masonry wall bowing was not caused by deflection of the underlying wall.

P.O. BOX 702, 512 GRAYSON PARKWAY, GRAYSON, GA 30045
T 678-225-4900 U WWW.RUNKLECONSULTING.COM

Moreover, the **nature of the damage described by Mr. Kornegay corresponds directly** with those outlined in the FEMA publication titled *"Attachment of Brick Veneer in High-Wind Regions"* (attached).



There is no visible bowing in the underlying brick masonry wall that would have affected the veneer.



No visible bowing of the masonry wall beneath the veneer.




The above photo was taken of the wall before the storm before the signs were removed. Note there is no visible bowing.

Given that:

- The wall was undamaged and plumb before Hurricane Helene;
- The type of damage aligns with FEMA's documented patterns resulting from wind-induced veneer failure;
- And Mr. Kornegay's findings are corroborated by your photographic evidence and authoritative FEMA guidance;

**It is my professional opinion** that **Mr. Kornegay's conclusion**—that the damage to the brick veneer was caused by storm forces—is **accurate and well supported**.

Please feel free to contact me if you would like to discuss this further.

Sincerely,

**George W. Runkle III, MS, PE, SE**
President
Runkle Consulting, Inc.
512 Grayson Parkway
Grayson, GA 30017
Office: 678-225-4900
Cell: 404-925-1477
Email: georger@runkleconsulting.com




**Attachment:** FEMA Publication – *Attachment of Brick Veneer in High-Wind Regions*

**EXHIBIT "E"**

Plaintiff's First O.C.G.A. § 33-4-6 Bad Faith Demand Letter

**Tim C. Cramer**
tim@cramerpeavy.com
**James E. Peavy**
Jim@cramerpeavy.com

770-227-4955 Telephone

Cramer & Peavy
Attorneys At Law

**Jason G. Cramer**
jason@cramerpeavy.com
**Ryan K. Johnson**
ryan@cramerpeavy.com

770-227-3009 Facsimile

October 15, 2025

Mount Vernon Fire Insurance Company
C/o Register Agent Heather Veik
10330 Regency Drive, Suite 100
Omaha, NE. 68114

Bob Pace
USLI
1190 Devon Park Drive
Wayne Pa. 19087

| | | |
|---|---|---|
| Re: | My Client: | Jeff Denkins / Mason Park Properties LLC |
| | Your Claim: | 0-48291 |
| | Date of loss: | 9/27/24 |
| | Issuing Co: | Mount Vernon Fire Ins. Co. |
| | Policy: | CP 26596667B |

Dear Claims / Bob Pace:

The purpose of this letter is to provide additional claim information for the loss my client sustained when Tropical Storm Helene's winds damaged his building located at 10 Third Street, Jackson Georgia 30233. We are also putting you on notice that failure to properly adjust this claim in good faith will result in a bad faith claim filed against you pursuant to O.C.G.A. 33-4-6.

The subject building was constructed in 1892. In approximately the late 1920s, the brick veneer was added to the building. We have irrefutable evidence that there was no deflection in the brick veneer as of July 22, 2024 as established by Leonard Parker who completed removal of signage from the west wall as of that date. This fact is also memorialized by photographs taken by Mr. Parker during removal of the signage which display no crack in the mortar and absolutely no bulging of the veneer on the west wall. You must understand that Mr. Parker was on the west wall for a week removing the signs utilizing a 30-foot ladder. If there had been any mortar cracking or brick veneer bowing, he certainly would have readily seen it and the pictures he took would have displayed it.

On September 27, 2024, Hurricane Helene moved slowly through Jackson Georgia with sustained winds downing multiple surrounding trees. (See attached) Approximately 2 months

later someone noticed, for the first time, the crack in the mortar and bowing of the brick veneer on the subject property.

My client retained a general contractor named Bill Golden who performed a thorough search of the building and found no evidence of settlement or water damage to explain the 6-inch bowing of the brick veneer at the second-floor level. Also, my client engaged structural engineer Garry Kornegay to inspect the damage and determine the cause thereof. Mr. Kornegay observed a very obvious bulge in the brick covering over half of the elevation on the subject building. Mr. Kornegay observed that there was no bulge in the wall on the inside of the building. The exterior layer of brick appeared to be an addition to the original brick wall that was 3 to 4 courses thick depending on which floor. Mr. Kornegay noted that signs were removed from the west wall shortly before Hurricane Helene came through and no problems with the wall were reported. Mr. Kornegay inspected the property and determined in his professional opinion that the bulge in the brick veneer was caused by the negative wind pressure from the storm. Mr. Kornegay did not observe any signs of other potential causes of the veneer failure. The shape of the bulge appeared to indicate that there were very few or no brick ties attaching the veneer to the original brick wall. Mr. Kornegay recommended shoring the wall and then removing the brick veneer starting at the top and progressing down.

After receiving Mr. Kornegay's findings, you retained the services of Rimkus to inspect the cause of the west wall damage. Carmelo Gorrido, an engineer employed by Rimkus concluded that the veneer movement was a result of long-term normal loading on the building. He acknowledged that the configuration of the attachments between the brick masonry and veneer piles was not visible, but it was apparent that those were failing. To bolster his opinion, Mr. Gorrido noted that at the second floor there was horizontal cracking present in the brick masonry on the exterior which contained debris, dirt and cobwebs within the crack. On the interior of the building, the walls were out of plum and leaning outwards at both the first and second floors. The interior out of plum condition was less than the exterior. There was also a noted gap between the window frame and window on the second floor and displacement was present between the still and rowlock which Google earth showed had been present for several years before the subject storm. He opined that most of any negative pressure from the storm would have affected the roof which did show some effects of negative pressure behind the parapet of the west wall. However, since tropical storm winds are known not to have uniform effects on structures, it is not surprising that the roof was mostly spared but the west leeward wall was not. He further opined that if Hurricane force winds had struck the west wall there would be evidence of damage to the second-floor diaphragm which was not present. Finally, he stated that there had been several other times that wind speeds had been similar or greater than on September 27, 2025 in Jackson's past insinuating since those didn't do any damage then the present storm didn't either.

On January 21, 2025 adjuster Bob Pace officially declined to extend coverage for my client's loss, blaming the damage to the brick veneer as being caused by the excluded perils of wear and tear; deterioration; cracking; shrinking; expansion; or faulty, inadequate, or defective materials used in repairs, renovations, or remodeling; and maintenance. The wall exhibited

horizontal cracks on the exterior with debris and cobwebs, and first floor interior drywall was cut to fit the movement within the wall, which occurred prior to the remnants of Hurricane Helene affecting the area.

In reaching his decision, the adjuster relied exclusively on Rimkus engineer Carmelo A. Garrido. On the date that the Rimkus engineer inspected my client's loss, the bulging brick veneer had not been removed to disclose the underlying load bearing masonry wall. Mr. Garrido relied on supposition that since the interior walls had some offset, then the exterior wall would have corresponding offset. Further, the fact that for many years the second-floor window had some separation in the wood comprising the window suggested previous similar problems with the brick veneer that predated the Hurricane winds.

In February-March of this year, my client had to pay out-of-pocket to repair the wind damaged brick veneer as he could not leave it in that condition for safety reasons. General contractor Bill Golden employed brick masons to brick-by-brick tear down the brick veneer and rebuild it. That was the only way that the repair could be performed. Upon removing the brick veneer, the exposed load bearing wall was found to be plum from top to bottom including in the areas where the wind had pulled the veneer from the load bearing wall. The fact that the underlying load bearing wall was plum refutes any assertions by the Rimkus engineer that since the interior walls were offset there must have been some offset or movement of the load bearing wall. During the repair it was observed that the bulging brick veneer had been attached by ties that had been pulled loose by some force which Mr. Kornegay found to be the negative pressure forces from the storm. As far as the second-floor window wood separation is concerned, that can easily be explained by the expanding and contracting effects of the sun and temperature changes on wood over time. Admittedly the wood in the window had separated many years before the storm but there was no brick veneer bowing corresponding with that wood separation as late as July 22, 2024.

There was no water damage or structural settling to explain the veneer failure. The ground around the wall was bone dry. The base of the veneer wall was structurally sound with no evidence of settlement. In fact, the first approximately 5 feet comprising the base of the wall did not have to be replaced during the repair.

My client had a second structural engineer named George Runkle review the findings of Kornegay and Garrido. He was influenced most by the fact that there was no deflection of the veneer just two months before the storm and that the underlying load bearing wall was found to be plum after the damaged veneer was removed. There was no explanation for the veneer failure such as settlement or water intrusion. Long term load bearing was not an explanation absent some structural abnormality. Once the veneer removal disclosed that the underlying masonry wall was plum, it left only the negative pressure from the tropical storm as the culprit. Mr. Runkle specifically found that the nature of the damage corresponds directly with the effects of negative force winds confirming Mr. Kornegay's findings.

**Discussion and Demand**

My client's building faces due North. Tropical Storm Helene approached the subject building heading due north. This approach ensured that the west wall of the building would be subject to the pulling leeward wind forces. Tropical storm winds are not uniform on exterior brick veneer. The positive pressure on the windward (south) side of the building pushes the veneer inward, while the negative pressure on the leeward (west) side pulls the veneer outward. High winds can cause new horizontal cracks to appear in the mortar joints. They may also widen and lengthen pre-existing cracks, which could have formed due to normal settlement or thermal expansion. Considering this brick veneer was installed around the 1920s under an outdated local building code, it will come as no surprise that although structurally sound with no water intrusion or settlement noted that tropical storm winds upwards of approximately 60 miles an hour that move slowly through the area with its positive and negative pressures will have a much more pronounced effect than if it was a newly constructed veneer wall. You knew what you were insuring in this building as most of the conditions noted by Mr. Garrido including the separation in the wood of the second-floor window, the offsets in the interior wall structures etc. were present at the time the building was insured except for the crack in the mortar and the deflection of the brick veneer. It is interesting that Mr. Garrido never addressed the fact that several trees in Jackson were downed due to the effects of the storm. It is further perplexing that Mr. Garrido had pictures of the west wall taken two months before the storm which displayed no cracks in the mortar or bulges in the veneer on the west wall yet he concluded that cobwebs and debris coupled with the long-standing wood separation in the second floor window proved the horizontally cracked mortar had predated the storm for several years. Mr. Gerrido did not inspect the property until several months after the storm. During that time frame it is understandable that the cracked mortar would be subject to cobwebs and other debris. Mr. Gerrido loses all credibility when he failed to note downed trees in the area and totally ignored the picture taken just two months before the storm showing no cracks in the mortar. Mr. Garrido didn't even request to speak with Leonard Parker who spent a week in July removing signage and observed no mortar cracking and bulging veneer. Mr. Gerrido also tries to insinuate that since there had been other high wind days in the past in Jackson that didn't cause damage to the wall then winds couldn't be the cause of the damaged veneer. However, all winds are not created equal. Linear winds do not have the same negative pulling forces that are involved in slow moving tropical storms with sustained negative force winds. Finally, there is no merit to Mr. Gerrido's argument that there would have been damage to the second-floor diaphragm had the storm winds caused the damage to the brick veneer as the storm winds were not great enough to pull the veneer completely lose so you would not expect those same winds to be strong enough to damage the second-floor diaphragm.

This case isn't even close. You insured my client's building with the second-floor window wood separation and out of plum interior walls as my client had not made any additions or repairs to those structures since he purchased it in 2013. Then you hire an expert to use those same findings to suggest there were long standing structural problems with the load bearing masonry wall/brick veneer. Unfortunately for you, we have pictures of the veneer just two months before the storm that prove the veneer was not bowing nor was the mortar cracking. We

also have evidence of an underlying plum masonry load bearing wall with no evidence of deflection to explain the reason for the brick veneer failure. The material evidence points to one cause of the veneer deflection and that is tropical storm sustained force winds applying negative pressure on a veneer that was installed over 90 years ago. High speed linear winds involving limited negative pressure were not a problem in the past rather it was the slow movement of and sustained Tropical Storm Helene winds with their intense negative pressure that damaged the brick veneer. Both Kornegay and Runkle relied on the material findings in reaching their decision that negative force winds from the storm caused the damage whereas Garrido relied on supposition that proved to be meritless upon further inspection.

We have attached the invoices that were incurred by my client for removal and then replacing the brick veneer. The invoices total $151,469.61. There is a 2% deductible under the policy for wind damage. That brings my client's property damage claim for the wind damage to a total of $103,469.61. Pursuant to O.C.G.A. 33-4-6, my client hereby demands Mount Vernon Fire Ins. Co. to pay $103,469.61 to settle his property damage claim resulting from the wind damage in exchange for a general release of all claims. This demand is being sent by certified mail, return receipt requested. This demand shall remain open for 60 days from your receipt. Failure to make timely payment will subject Mount Vernon Fire Ins. Co. to bad faith penalties of 50% of the total claim and attorney's fees. My client is ready to take his claim to court if you fail to honor the insurance contract by refusing to pay his meritorious claim.

Sincerely,

*James E. Peavy*

James E. Peavy

**EXHIBIT "F"**

Second Denial Letter

USLI

December 15, 2025

Cramer & Peavy
436 S Hill St
Griffin, GA 30224
Attn: James E. Peavy

***Via Certified Mail and Email Jim@cramerpeavy.com***

| | | |
|---|---|---|
| RE: | Claim No.: | 0-48291 |
| | Reported date of loss: | 09/27/2024 |
| | Policyholder: | Mason Park Properties LLC |
| | Policy Number: | CP 2659667B |
| | Policy Effective Dates: | 08/11/2024 - 08/11/2025 |
| | Issuing Company: | Mount Vernon Fire Insurance Company |

Dear James E. Peavy:

We acknowledge receipt of your correspondence dated October 15, 2025, regarding the above-referenced claim. In response to your letter and the engineering report prepared by Mr. George Runkle, we requested that our retained engineer, Mr. Carmelo Garrido, P.E., of Rimkus Consulting Group, review Mr. Runkle's findings and reevaluate the cause of the reported damage.

After a thorough review, Mr. Garrido has reaffirmed the conclusions set forth in his original report dated January 10, 2025. Specifically:

- The outward displacement of the brick veneer on the west elevation was not caused by negative wind pressures from Hurricane Helene.
- The condition was long-term and pre-existing, attributable to inadequate structural connections and age-related deterioration, rather than any wind-related forces from the storm.

Mr. Garrido's enclosed supplemental report further notes that wind speeds during the storm were typical for the region and insufficient to cause the type of displacement observed. Additionally, evidence of debris and discoloration within the masonry cracks supports a long-standing condition rather than sudden storm-related damage.

Based on this engineering analysis and the terms of the policy, we must respectfully reaffirm our previous position that coverage does not apply to this loss, and no payment will be issued. The damage falls within exclusions for wear and tear, deterioration, and faulty construction.

Should you have additional information that you believe may impact this determination, please forward it for our review. Otherwise, our position remains unchanged.

Sincerely,

Bob Pace
Property Examiner

**EXHIBIT "G"**

Plaintiff's Second O.C.G.A. § 33-4-6 Bad Faith Demand Letter

*Stephanie W. Windham
Janice M. Wallace
Karl P. Broder

*AV Preeminent®
Martindale-Hubbell®
Peer Review Rating™

BECK, OWEN & MURRAY

Attorneys at Law

www.beckowen.com

David E. Penland
Nathan R. Greene
Cara E. Clark

John O'Neal
Of Counsel

William M. Dallas III
Emeritus

February 26, 2026

Mount Vernon Fire Insurance Company
C/o Ms. Heather Veik, Register Agent
10330 Regency Drive, Suite 100
Omaha, NE 68114

Bob Pace (USLI)
190 Devon Park Drive
Wayne, PA 19087

Re: **My Client: Jeff Denkins / Mason Park Properties LLC**
**Your Claim: 0-48291**
**Date of loss: 9/27/24**
**Issuing Co: Mount Vernon Fire Ins. Co.**
**Policy: CP 26596667B**

Dear Mr. Pace:

My name is John O'Neal, and I am an attorney with the law firm of Beck Owen & Murray in Griffin, Georgia. We have been retained to represent Mason Park Properties, LLC ("Mason Park") regarding the above-listed claim number. As you are aware, my client's commercial building, located at 10 Third Street, Jackson Georgia 30233, was damaged as a result of Hurricane/Tropical Storm Helene, which tore through Jackson and Butts County on September 27, 2024, damaging the homes and land of thousands of people in this rural community.

Specifically, this claim concerns the brick veneer on the westward-facing exterior wall of the building located at 10 Third Street, Mason Park. I am in receipt of your letter dated December 15, 2025, in which you refused to pay the above-referenced insurance claim.

That correspondence was sent in response to a Notice of Bad Faith, pursuant to O.C.G.A. § 33-4-6, which was issued by my client's prior counsel, Mr. James Peavy, on or about October 15, 2025.

Please let this correspondence serve as Mason Park's final notice of its intent to file a bad faith action should USLI/Mount Vernon Fire Insurance Company ("Mount Vernon") fail to pay my client's claim.

For purposes of this notice, I am reincorporating the information, facts, and analysis of Mr. Peavy, and I have enclosed a copy of Mr. Peavy's letter for your convenience. Additionally, I wish to address two issues you raised in your previous letter. ULI/Mount Vernon's denial of my client's claims are based on Mr. Carmelo Garrido, P.E.'s (Rimkus Consulting Group) supplemental report,

which reaffirms two findings:

1) The outward displacement of the brick veneer on the west elevation was not caused by negative wind pressures from Hurricane Helene; and
2) The condition was long-term and pre-existing, attributable to inadequate structural connections and age-related deterioration, rather than any wind-related forces from the storm.

Below, I will address the issue with each of these findings in turn.

***1) The outward displacement of the brick veneer on the west elevation was not caused by negative wind pressures from Hurricane Helene***

Mr. Garrido's statement that the outward displacement of the brick veneer was not impacted by Hurricane Helen is, quite frankly, not credible given the facts. Mr. Garrido states in his supplement report that

> "While CoreLogic indicated that wind speeds up to 55 miles per hour (mph) were reported in the immediate vicinity of the building during Helene, these wind speeds are common for this area and were not the highest wind speeds reported at the property."

You reaffirm this in your letter when you state that Garrido's report "further notes that wind speeds during the storm were typical for the region and insufficient to cause the type of displacement observed." But that is simply not the case.

I am not privy to the information and methods of calculation in the CoreLogic system, nor to what data Mr. Garrido is using to substantiate his claim that 55 mph winds are "common" for Jackson, GA, the University of Georgia publishes the data it records at its weather stations located throughout the state. The closest to Jackson is located in Covington, Georgia, approximately 12 miles away. The furthest back a person may search for data via the website is one year, but when a search for data averages is performed for the dates of June 1, 2025 through November 30, 2025, the highest windspeed during that time is 6.04 mph on October 17, 2025. On September 29, 2025 (a date similar to the date Helene came through), winds were recorded at 3.29 mph. A copy of the data referenced is also enclosed for your convenience.

I chose the aforementioned range of dates, specifically, because (as I am sure you are aware) that is hurricane season. As I am also sure you aware, 55 mph sustained winds are the strength of a Tropical Storm. Tropical Storms, of course, are weather events that take place mainly in coastal regions, but Jackson, GA is some 220 miles from the coast (as the crow flies). Respectfully, the position that Tropical Storm-force winds are "common" events for Jackson is not a credible one to take.

***2) The condition was long-term and pre-existing, attributable to inadequate structural connections and age-related deterioration, rather than any wind-related forces from the***

***storm.***

Next, Mr. Garrido states in his supplemental report that upon review of the report Mason Park's second structural engineer, Mr. George Runkle, noticed "no visible brick ties were present" indicating there was a "structurally inadequate connection" between the load barring wall and damaged brick veneer. Indeed, the lack of ties was also pointed out by Mason Park's initial engineer's report from Mr. Garry Korngay – that there were few or no brick ties at the place of brick veneer's bulge.

However, neither Mr. Korngay nor Mr. Runkle attributed the lack of ties as a cause of the brick veneer's damage. Rather, both stated that the negative pressure was the blame, as the underlying load baring brick wall was plumb. Mr. Garrido seems intent on blaming the veneer's bulge on a lack of brick ties to the load baring wall; however, not one, but two, different engineers have issued reports stating the exact opposite. Even if an abundance of brick ties had been in place when the photos in Mr. Runkle's report were taken, that would have no effect on the veneer so far as causing the bulge and cracking. Rather, again, it was the pressure on the masonry caused by the Tropical Storm winds of then-downgraded Hurricane Helene.

**Based on the foregoing, we are again demanding payment from USLI/Mount Vernon to pay $103,469.61 to settle his property damage claim resulting from the wind damage in exchange for a general release of all claims**. Again, this is Mason Park's final demand, and shall remain open for 10 days from your receipt, with a response due no later than March 9, 2026. Failure to make timely payment will subject Mount Vernon to bad faith penalties of 50% of the total claim and attorney's fees. Should USLI/Mount Vernon continue to refuse payment, my client will file a complaint in the Superior Court of Butts County, as well as with the Insurance Commissioner of Georgia.

Should you have any questions or concerns, please do not hesitate to contact me

Sincerely,

John T. O'Neal

JTO
Encl.

# EXHIBIT "H"

Third Denial Letter

WSHB

1230 Peachtree Street NE • Suite 2350 • Atlanta, GA • 30309
tel (470) 552-1150 • fax (470) 552-1151 • wshblaw.com

P. Jeffery Rowe
direct dial (470) 552-1173
email prowe@wshblaw.com

April 3, 2026

**VIA FEDEX OVERNIGHT AND E-MAIL**
Beck, Owen & Murray
John T. O'Neal, Esq.
100 South Hill Street
One Griffin Center Suite 600
Griffin, Georgia 30223

| | | |
|---|---|---|
| **RE:** | **INSURED:** | **MASON PARK PROPERTIES LLC** |
| | **POLICY NO:** | CP 2659667B |
| | **CLAM NO.** | 0-48291 |
| | **POLICY PERIOD:** | August 11, 2024 to August 11, 2025 |
| | **DATE OF LOSS:** | September 27, 2024 |
| | **WSHB FILE NO.:** | 06131.0148 |

Dear John:

As you know, we represent Mount Vernon Fire Insurance Company (the "Company"), which issued Policy No. CP 2659667B to Mason Park Properties LLC (the "Insured") for the policy period August 11, 2024 to August 11, 2025 (the "Policy").[1] The Policy provides lessor's risk coverage to commercial property located at 10 Third Street, Jackson, Georgia 30233 (the "Property"), subject to its terms, provisions, conditions, and exclusions.

We write in response to your demand letter dated February 26, 2026 (the "Demand"), which seeks payment in the amount of $103,469.61 related to the claim of property damage purportedly occurring during Hurricane Helene on or about September 27, 2024. The Demand requested a response and payment by March 9, 2026. We thank you for agreeing to extend the Company's deadline to respond by an additional thirty (30) days, up to and including April 6, 2026.

The Demand references a prior letter issued by prior counsel, which was sent pursuant to O.C.G.A. § 33-4-6 on or about October 15, 2025. The Demand alleges that the Company improperly refused to pay the claim, improperly investigated, and otherwise engaged in bad faith tactics to settle the claim, while also signaling bad faith penalties and litigation. The Company categorically rejects each and every one of these assertions and further denies that it has engaged in any of the conduct alleged in the Demand.

Based on the Company's investigation, including the conclusions independently reached by the Company's independent adjuster as well as its engineer, the Company

[1] A true and correct copy of the Policy is attached here for your records as **Exhibit A**.

reiterates the coverage determination as outlined in its prior letters as the alleged property damage was not caused by Hurricane Helene.[2] In short, because the claim does not trigger coverage under the Policy, no payment will be forthcoming at this time. The Company provides a factual background and explains the basis for its decision below.

## I. Factual Background and the Initial Claim Investigation

The Insured's claim arises out of property damage allegedly caused by negative wind pressure during Hurricane Helene occurring on or about September 27, 2024. The Insured notified the Company of the Loss on or about December 16, 2024, listing the date of loss as "09/27/2024". The Company retained Tenco Services ("Tenco") as the independent adjustment firm to investigate and adjust the claim on its behalf. Tenco contacted the Insured and scheduled an inspection for December 19, 2024.

Tenco's inspection revealed some damage at the Property, including the presence of a large bow in the brick veneer on the exterior of the west wall and also some separation on the inside of the building related to the inner portion of the same wall. There was no evidence of water damage on the interior of the building related to the loss.

Jeff Denkins, on behalf of Mason Park Properties stated that he had previously had an issue with roof along the roof wall on the front elevation. Mr. Denkins stated that he had some signs removed from the right elevation over the summer (prior to the storm), which had been placed by a tenant who had already moved out. Mr. Denkins informed Tenco that he was unsure of the age of the brick exterior covering but believed that it was likely put on some time in the 1970s.

### A. The Engineers' Inspections

Prior to Tenco's inspection, Jeff Denkins commissioned an investigation from Kornegay Engineering to perform its visual investigation of the building on November 25, 2024. Consistent with Tenco's observations, Kornegay observed the bulge on the exterior wall of the building but observed no bulge or damage on the inside wall of the building. Kornegay's investigation concluded that the damage to the exterior wall was caused by negative wind pressures from Hurricane Helene. Kornegay did not document any evidence of water intrusion. However, the engineer did observe a lack of brick ties attaching the veneer to the original brick wall.

The Company then retained Rimkus as its engineering firm to perform its own independent inspection of the Property on December 31, 2024. Rimkus determined that the outer brick veneer movement was not caused by negative pressures on the west elevation during Hurricane Helene. Rather, Rimkus concluded that the outer brick veneer movement at the west wall was a long-term, preexisting condition that was present for years prior to the passage of Helene. Rimkus' investigation revealed visible cracks in the exterior brick masonry that were filled with debris and cobwebs, indicative of a long-term problem. Rimkus determined that the walls leaning outwards on both the first and second

---

[2] The Company's prior letters dated January 21, 2025 and December 15, 2025 are fully incorporated herein by reference and are attached as **Exhibit B**.

floor. Notably, the first-floor gypsum boards were cut to fit the out of plumb wall conditions. Separations were present behind the baseboard of the south unit and at the wall to wall joint. Displacement was also present between the still and rowlock of certain windows on the second floor. Google Street View pictures from previous years depict the presence of this displacement from years before Hurricane Helene.

The Company issued its initial coverage letter on January 21, 2025 explaining no coverage for the loss and inviting Mason Park Properties to submit additional information for the Company's consideration.

### B. The Demand Letters and Request for Payment

The Company received a demand for payment under O.C.G.A. § 33-4-6 on October 15, 2025. The Company responded to this demand by letter on January 21, 2025. Another demand letter on behalf of Mason Park Properties was sent to the Company on February 26, 2026. This second letter sought $103,469.61 to settle the property damage claim and requested a response by March 9, 2026, threatening bad faith, a complaint with the Insurance Commissioner of Georgia, and potential litigation.

After the Company retained our firm as coverage counsel, we contacted you via email on March 3, 2026 to acknowledge the Demand and to request an extension of time to respond to the demand letter. You graciously agreed to a one-month extension to which we respond. The Demand reaffirmed the previous calculation of damages in the amount of $103,469.61 and contested Rimkus' findings that the bulge on the Property's west wall was a result of a longstanding condition and the assertion that a lack of brick ties played a part in the damage to the wall. The Demand does not include any documents demonstrating that the Insured has incurred costs to repair or replace damaged property or evidence that repairs or replacement have been completed.

## II. Policy Details

Mount Vernon Fire Insurance Company (again, "the Company") issued Policy No. CP 2659667B to Mason Park Properties LLC for the policy period August 11, 2024 through August 11, 2025 (again, the "Policy").[3] The Policy is lessor's risk policy providing certain coverage for commercial property located at 10 3rd Street, Jackson, Georgia 30233 (the "Property"). The Policy carries a limit of $2,415,000 for the Building, which is subject to a 2% ($48,000) Wind and Hail Deductible. *See* Policy Declarations Page, CF 150 (01/03).

## III. The Company is Denying Coverage for the Claim Because There is No Covered Cause of Loss Under the Policy

Based on the foregoing, the Company timely adjusted the claim based on its investigation and based upon all information available to date. The Company has attempted to and continues to attempt to work with the Insured in good faith regarding its claim. The Policy's insuring agreement provides in relevant part as follows:

---

[3] The Company is a member of United States Liability Insurance Group. *See* Policy Declarations, UPD (08-07), p. 1 of 1.

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

***

**A. Covered Causes of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:

**1.** Excluded in Section **B**., Exclusions; or

**2.** Limited in Section **C**., Limitations;

that follow.

**B. Exclusions**

***

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

***

**d.** **(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

***

**(4)** Settling, cracking, shrinking or expansion;

***

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

***

**c.** Faulty, inadequate or defective:

***

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction,

renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

*See* Policy, CP 00 10 06 07, p, 1 of 15; CP 10 30 06 07, pp. 1-4 of 10.

As outlined above, neither Tenco nor Rimkus observed any storm-related damage to the Property as a result of Hurricane Helene triggering coverage under the Policy. The Company acknowledges that Gary Kornegay believes the bulge in the Property's western exterior wall was caused by negative wind pressure from the storm. Notably, Mr. Kornegay did not note the presence of any other potential causes of damage, nor did his investigation of the interior of the Property reveal a bulge or any other evidence of damage.

To confirm, Rimkus, the Company's engineer, observed several structural issues with the western wall, including horizontal cracks in the brick masonry that were filled with debris and cobwebs. Rimkus further noted that the inside walls were out of plumb and leaning outwards, including gaps and displacement between certain second story window sills and rowlocks. Any movement of the Property's outer brick veneer was a long-term, pre-existing condition that was present prior to the passage of Helene. Google Street View images from 2021 depict visible issues with the structural integrity of the subject wall.

The Policy language cited above excludes coverage for wear and tear, deterioration, hidden defects, settling, expansion, as well as faulty, inadequate construction, renovation, or maintenance.

At this time, the Company must reject your client's demand for payment in the amount of $103,469.61 as well as any assertion that it has acted in bad faith, violated the Policy, or acted improperly under Georgia law. The Company rejects every single assertion contained in the Demand. The Company continues to reserve all of its rights under applicable law and under the terms of the Policy. This letter should not be construed as a waiver of any of the Policy's terms, conditions, or exclusions. The Company specifically reserves the right to further deny coverage and to require compliance with all of the Policy's conditions before suit is filed.

**IV. <u>Complete Reservation of Rights</u>**

Notwithstanding the Company's decision to deny coverage under the Policy, the Company continues to reserve all rights available to it under the Policy and applicable law. This includes, but is not limited to, the right to investigate, deny coverage in part or whole, and/or seek a judicial determination in a declaratory judgment and/or rescission action. In addition, the Company reserves the right to supplement or amend this Reservation of Rights letter upon the discovery of additional facts, subject to the Policy's terms, conditions, exclusions, and endorsements, including those not discussed in this letter.

If there is any additional information or documents you believe the Company should consider as part of the Insured's claim, we ask that you provide this as soon as practicable. Your assistance and cooperation with the ongoing investigation under this Reservation of Rights letter is required and appreciated. You may also call us if you have any additional questions or wish to discuss the matter further.

Should you have any questions or wish to discuss, feel free to contact us.

Sincerely,

**WOOD, SMITH, HENNING & BERMAN, LLP**

P. Jeffery Rowe

PJR/DPR

Enclosures

# IN THE SUPERIOR COURT OF BUTTS COUNTY
# STATE OF GEORGIA

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
BUTTS COUNTY, GEORGIA
2026-SU-V-0228
THOMAS WILSON
MAY 11, 2026 04:57 PM

Morgan V. Ward
Morgan V. Ward, Clerk
Butts County, Georgia

CIVIL ACTION NUMBER 2026-SU-V-0228

Mason Park Properties, LLC

**PLAINTIFF**

**VS.**

Mount Vernon Fire Insurance Company, a foreign corporation
United States Liability Insurance Company, a foreign corporation

**DEFENDANTS**

## SUMMONS

TO: MOUNT VERNON FIRE INSURANCE COMPANY, A FOREIGN CORPORATION

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

**John O'Neal**
**Beck Owen & Murray**
**100 South Hill Street - Suite 600**
**Griffin, Georgia 30223**
**joneal@beckowen.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 11th day of May, 2026.**

Clerk of Superior Court

Morgan V. Ward
Morgan V. Ward, Clerk
Butts County, Georgia

**IN THE SUPERIOR COURT OF BUTTS COUNTY**
**STATE OF GEORGIA**

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
BUTTS COUNTY, GEORGIA
**2026-SU-V-0228**
**THOMAS WILSON**
**MAY 11, 2026 04:57 PM**
Morgan V. Ward
Morgan V. Ward, Clerk
Butts County, Georgia

CIVIL ACTION NUMBER 2026-SU-V-0228

Mason Park Properties, LLC

**PLAINTIFF**

**VS.**

Mount Vernon Fire Insurance Company, a foreign corporation
United States Liability Insurance Company, a foreign corporation

**DEFENDANTS**

**SUMMONS**

TO: UNITED STATES LIABILITY INSURANCE COMPANY, A FOREIGN CORPORATION

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

**John O'Neal**
**Beck Owen & Murray**
**100 South Hill Street - Suite 600**
**Griffin, Georgia 30223**
**joneal@beckowen.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 11th day of May, 2026.**

Clerk of Superior Court

Morgan V. Ward
Morgan V. Ward, Clerk
Butts County, Georgia

C. Lockwood 484

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
BUTTS COUNTY, GEORGIA
2026-SU-V-0228
THOMAS WILSON
MAY 11, 2026 04:57 PM
Morgan V. Ward
Morgan V. Ward, Clerk
Butts County, Georgia

# General Civil and Domestic Relations Case Filing Information Form

☑ Superior or ☐ State Court of Butts County

**For Clerk Use Only**

**Date Filed** 05-11-2026 (MM-DD-YYYY) **Case Number** 2026-SU-V-0228

| Plaintiff(s) | Defendant(s) |
|---|---|
| Mason Park Properties, LLC | Mount Vernon Fire Insurance Company, a foreign |
| Last First Middle I. Suffix Prefix | Last First Middle I. Suffix Prefix |
| | United States Liability Insurance Company, a f |
| Last First Middle I. Suffix Prefix | Last First Middle I. Suffix Prefix |
| | |
| Last First Middle I. Suffix Prefix | Last First Middle I. Suffix Prefix |
| | |
| Last First Middle I. Suffix Prefix | Last First Middle I. Suffix Prefix |

**Plaintiff's Attorney** O'Neal, John **Bar Number** 822618 **Self-Represented** ☐

**Check one case type and, if applicable, one sub-type in one box.**

**General Civil Cases**

- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contract
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☑ Other General Civil

**Domestic Relations Cases**

- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_______________ Case Number _______________ Case Number

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_______________ Language(s) Required

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
BUTTS COUNTY, GEORGIA
2026-SU-V-0228
THOMAS WILSON
JUN 02, 2026 12:20 PM
Morgan V. Ward
Morgan V. Ward, Clerk
Butts County, Georgia

To: All Judges, Clerks of Court, and Counsel(s) of Record

From: John T. O'Neal

RE: **APPLICATION FOR LEAVE OF ABSENCE**

Date: June 2, 2026

COMES NOW, John T. O'Neal and, pursuant to Georgia Uniform Court Rule 16.2, respectfully files this, Counsel's Application for Leave More than 30 Days, to all judges before whom he has cases pending, all affected clerks of court, and all opposing counsel, that he will be on leave pursuant to Georgia Uniform Court Rule 16 as follows:

1. Applicant will be away from the practice of law for the purposes of sick leave, vacations, children's school activities, and birthdays of children, and the periods of leave as follows:

   **June 1-5, 2026**
   **June 8, 2026**
   **July 3, 2026**
   **July 31, 2026**
   **August 3–7, 2026**
   **August 10–11, 2026**
   **September 4, 2026**
   **October 9, 2026**
   **October 12-16, 2026**
   **November 5-6,2026**
   **November 23, 2026**
   **November 24 and 25, 2026**
   **December 21-23, 2026**
   **December 28-30, 2026**
   **December 31, 2026**

2. All affected judges and opposing counsel shall have ten days from the date of this Notice to object to it. If no objections are filed, this application for leave shall be granted without entry of an order.

3. I certify that I am counsel in the cases listed in Exhibit "A" and that these matters cannot be adequately handled, and my client's interests adequately protected by other counsel in these actions or by other attorneys in my law firm.

Respectfully submitted,

**BECK, OWEN & MURRAY**

John T. O'Neal
Georgia State Bar No. 822618

One Griffin Center, Suite 600
100 South Hill St.
Griffin, GA 30223
Phone: (770) 227-4000
Fax: (770) 229-8524
joneal@beckowen.com

## Exhibit A

| | | |
|---|---|---|
| Mason Park Properties, LLC vs. Mount Vernon Fire Insurance Company, a foreign corporation, and United States Liability Insurance Company, a foreign corporation<br><br>CA No.: 2026-SU-V-0228 | Honorable Thomas Wilson<br><br>Butts County Superior Court | |

**CERTIFICATE OF SERVICE**

This is to certify that I have this date served a copy of the foregoing Notice of Leave of Absence upon all judges, clerks and opposing counsel by electronic filing via Peachcourt or Odyssey.

This 2nd day of June, 2026.

**BECK, OWEN & MURRAY**

John T. O'Neal
Georgia State Bar No. 822618

One Griffin Center, Suite 600
100 South Hill St.
Griffin, GA 30223
Phone: (770) 227-4000
Fax: (770) 229-8524
joneal@beckowen.com

SHERIFF'S ENTRY OF SERVICE 2026MO0444 SECOND ORIGINAL

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
BUTTS COUNTY, GEORGIA
2026-SU-V-0228
THOMAS WILSON
JUN 11, 2026 08:58 AM
Morgan V. Ward
Morgan V. Ward, Clerk
Butts County, Georgia

Civil Action No. 2026-SU-V-0228

Superior Court ☐
State Court ☐
Juvenile Court ☐
Magistrate Court ☐
Probate Court ☐

PAID
MAY 29 PAID
By FCMO-0578

Date Filed 5-11-26

Georgia, BUTTS COUNTY

Mason Park Properties, LLC

JUN 2 REC'D

Plaintiff

Attorney's Address

John T. O'Neal, Beck, Owen & Murray

100 South Hill Street, Suite. 600

Griffin, GA 30223

VS.

Mount Vernon Fire Insurance Company and

United States Liability Insurance Company

Defendant

Name and Address of Party to Served

United States Liability Ins. Co. c/o Reg. Agei

John Bonnie, 3344 Peachtree Rd., Ste. 240(

Atlanta, GA 30326

Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
I have this day served the defendant ______ personally with a copy
☐ of the within action and summons.

**NOTORIOUS**
I have this day served the defendant ______ by leaving a copy of the action and summons at his most notorious place abode in this County.

☐ Delivered same into hands of ______ described as follows: age, about ______ years; weight ______ pounds; height ______ feet and ______ inches, domiciled at the residence of defendant.

**CORPORATION**
Served the defendant United States Liability Ins CO a corporation

☒ by leaving a copy of the within action and summons with John Bonnie
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an
☐ envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST**
Diligent search made and defendant ______
☐ not to be found in the jurisdiction of this Court.

This 4 day of June, 2026.

C. Lockwood 452

DEPUTY

CLERK'S COPY

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
BUTTS COUNTY, GEORGIA
2026-SU-V-0228
THOMAS WILSON
JUN 16, 2026 01:25 PM
Morgan V. Ward
Morgan V. Ward, Clerk
Butts County, Georgia

To: All Judges, Clerks of Court, and Counsel(s) of Record

From: John T. O'Neal

RE: **APPLICATION FOR LEAVE OF ABSENCE**

Date: June 15, 2026

COMES NOW, John T. O'Neal and, pursuant to Georgia Uniform Court Rule 16.2, respectfully files this, Counsel's Application for Leave More than 30 Days, to all judges before whom he has cases pending, all affected clerks of court, and all opposing counsel, that he will be on leave pursuant to Georgia Uniform Court Rule 16 as follows:

1. Applicant will be away from the practice of law for the purposes of sick leave, vacations, children's school activities, and birthdays of children, and the periods of leave as follows:

   **July 3, 2026**
   **July 6-8, 2026**
   **July 31, 2026**
   **August 3–7, 2026**
   **August 10–11, 2026**
   **September 4, 2026**
   **October 9, 2026**
   **October 12-16, 2026**
   **November 5-6,2026**
   **November 23, 2026**
   **November 24 and 25, 2026**
   **December 21-23, 2026**
   **December 28-30, 2026**
   **December 31, 2026**

2. All affected judges and opposing counsel shall have ten days from the date of this Notice to object to it. If no objections are filed, this application for leave shall be granted without entry of an order.

3. I certify that I am counsel in the cases listed in Exhibit "A" and that these matters cannot be adequately handled, and my client's interests adequately protected by other counsel in these actions or by other attorneys in my law firm.

Respectfully submitted,

**BECK, OWEN & MURRAY**

John T. O'Neal
Georgia State Bar No. 822618

One Griffin Center, Suite 600
100 South Hill St.
Griffin, GA 30223
Phone: (770) 227-4000
Fax: (770) 229-8524
joneal@beckowen.com

# CERTIFICATE OF SERVICE

This is to certify that I have this date served a copy of the foregoing Notice of Leave of Absence upon all judges, clerks and opposing counsel by electronic filing via Peachcourt or Odyssey.

This 15th day of June, 2026.

**BECK, OWEN & MURRAY**

John T. O'Neal
Georgia State Bar No. 822618

One Griffin Center, Suite 600
100 South Hill St.
Griffin, GA 30223
Phone: (770) 227-4000
Fax: (770) 229-8524
joneal@beckowen.com

**Exhibit A**

| | | |
|---|---|---|
| Mason Park Properties, LLC vs. Mount Vernon Fire Insurance Company, et al<br><br>CA No.: 2026-SU-V-0228 | Honorable Thomas Wilson<br><br>Butts County Superior Court | **United States Liability Insurance Company**<br>c/o Registered Agent, John Bonnie<br>3344 Peachtree Road, Suite #2400<br>Atlanta, GA 30326 |

**IN THE SUPERIOR COURT OF BUTTS COUNTY
STATE OF GEORGIA**

| | |
|---|---|
| MASON PARK PROPERTIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MOUNT VERNON FIRE INSURANCE COMPANY, a foreign corporation, and UNITED STATES LIABILITY INSURANCE COMPANY, a Foreign Corporation<br><br>Defendants. | CIVIL ACTION FILE NO.:<br><br>2026-SU-V-0228 |

**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT**

Defendants Mount Vernon Fire Insurance Company ("Mount Vernon"), a foreign corporation, and United States Liability Insurance Company ("USLI"), a foreign corporation (hereinafter "Defendants")[1], respectfully file and serve their Answer and Affirmative Defenses to Plaintiff Mason Park Properties, LLC's Complaint, showing this Court as follows:

**PARTIES, JURISDICTION & VENUE**

1.

Defendants are without knowledge as to the allegations in Paragraph No. 1, and therefore cannot admit or deny the same.

2.

Defendants deny the allegations contained in Paragraph No. 2 as stated. For further response, Defendants state that Mount Vernon is an eligible surplus lines insurer authorized to

[1] Plaintiff has named the incorrect parties in this case. USLI is an improper party and should be dismissed because it is not the insurer and did not issue the subject insurance policy to Plaintiff.

transact business in the State of Georgia. Defendants admit that Mount Vernon may be served through its service of suit clause nominee at 1190 Devon Park Drive, Wayne, Pennsylvania 19087 as described in the subject policy. Defendants deny the remaining allegations in Paragraph No. 2.

3.

Defendants deny the allegations contained in Paragraph No. 3 as stated. For further response, Defendants state that USLI is an eligible surplus lines insurer authorized to transact business in the State of Georgia. Defendants admit that USLI may be served through its service of suit clause nominee at 1190 Devon Park Drive, Wayne, Pennsylvania 19087 as described in the subject policy. Defendants deny the remaining allegations in Paragraph No. 3.

4.

Defendants admit that Plaintiff seeks damages more than $15,000.00 for jurisdictional purposes only. Defendants deny any and all allegations in the Complaint that Plaintiff may recover against USLI for breach of contract as alleged in the Complaint because USLI did not issue the subject insurance policy to Plaintiff.

5.

Defendants admit that venue is proper in this Court.

6.

Defendants admit the allegations alleged in Paragraph No. 6 of Plaintiff's Complaint for jurisdictional purposes only. Defendants deny any and all allegations in the Complaint that Plaintiff may recover for breach of contract, recovery of interest, bad faith damages arising out of denial of an insurance claim, and/or attorney fees and expenses.

## STATEMENT OF FACTS

7.

Defendants admit that Plaintiff was the owner of the commercial building located at 10 Third Street, Jackson, Butts County, Georgia 30233, that is the subject of this lawsuit (the "Property").

8.

Defendants are without knowledge as to the allegations in Paragraph No. 8, and therefore cannot admit or deny the same.

9.

Defendants admit that Mount Vernon issued Policy No. CP 2659667B to Mason Park Properties, LLC for the policy period August 11, 2024 to August 11, 2025 (the "Policy"), which provided certain lessor's risk coverage for the Property as described in the Commercial Property Coverage Part Declarations page. Defendants further state that the Policy must be interpreted subject to all of its terms, conditions, limitations and exclusions.

10.

Defendants deny the allegations in Paragraph No. 10 as stated. For further response, Defendants admit that the Policy contains certain commercial property coverages for the Property, which must be read in whole according to all of its terms, conditions, and exclusions.

11.

Defendants admit that Hurricane Helene made landfall and moved through Butts County, Georgia on or about September 27, 2024. Defendants are without knowledge as to the remaining allegations in Paragraph No. 11, and therefore cannot admit or deny the same.

12.

Defendants are without knowledge of when "Plaintiff was made aware" of damage to the Property as alleged in Paragraph No. 12. For further response, Defendants state that Plaintiff submitted written notice of the loss on or about December 16, 2024, listing the date of loss as "09/27/2024." Defendants admit, upon information and belief, that Plaintiff engaged Garry D. Kornegay to investigate the damage to the Property. Defendants acknowledge that Mr. Kornegay believes that certain Property damage was caused by negative wind pressure from the storm. Defendants deny the remaining allegations as alleged in Paragraph No. 12 of Plaintiff's Complaint.

13.

Defendants deny the allegations contained in Paragraph No. 13 as stated. For further response, Defendants admit that Mount Vernon retained Tenco Services, Inc. ("Tenco") as it's third-party claims adjuster to investigate the loss and assigned number 0-48291 to the claim. Defendants deny the remaining allegations as stated in Paragraph No. 13 of the Complaint.

14.

Defendants deny the allegations in Paragraph No. 14 of Plaintiff's Complaint as stated.

15.

Defendants admit that Mount Vernon retained Tenco as its third-party claims adjuster to investigate the loss, and independent adjuster Mike Derden inspected the Property on or about December 19, 2024. Defendants further admit that Mount Vernon then hired an engineer with Rimkus Engineering ("Rimkus"), and Carmelo Garrido conducted a second independent inspection of the Property on or about December 31, 2024.

16.

Defendants deny the allegations contained in Paragraph No. 16 as stated. For further response, Rimkus' inspection revealed that damage to the Property's brick veneer was not caused

by negative wind pressures from Hurricane Helene but by long-term damage that was present for years prior to the storm. Rimkus' investigation revealed visible cracks in the Property's exterior brick masonry that were filled with debris and cobwebs, indicative of long-term deterioration.

17.

Defendants deny the allegations contained in Paragraph No. 17 as stated, including the conclusory allegation that "Agent Bob Pace" primarily or solely denied coverage for Plaintiff's claim as alleged. For further response, Mount Vernon's representatives, including its independent adjuster and engineer conducted two inspections of the Property. Defendants admit that Mount Vernon issued multiple written correspondences to the Plaintiff, including on January 21, 2025 and December 15, 2025 setting forth its coverage position and explaining that the loss does not trigger coverage under the Policy. Defendants deny the remaining allegations contained in Paragraph No. 17.

18.

Defendants admit that Plaintiff's Complaint alleges repair costs in the amount of $151,469.61. Defendants are without knowledge as to the remaining allegations in Paragraph No. 18, and therefore cannot admit or deny the same.

19.

Defendants admit, upon information and belief, that Plaintiff retained George Runkle as a second engineer to review the prior findings and inspect the Property. Defendants are without knowledge as to the remaining allegations in Paragraph No. 19, and therefore cannot admit or deny the same.

20.

Defendants acknowledge that Mr. Runkle believes that certain Property damage was caused by negative wind pressure from Hurricane Helene. Defendants deny the remaining allegations as alleged in Paragraph No. 20 of Plaintiff's Complaint.

21.

Defendants acknowledge that Mr. Runkle believes that certain Property damage was caused by negative wind pressure from the storm. For further response, Defendants state that Rimkus independently reviewed Mr. Runkle's conclusions and observations and ultimately reaffirmed the opinion that Property damage was not caused by negative wind pressures from Hurricane Helene but by long-term damage that was present for years prior to the storm. Defendants deny the remaining allegations as alleged in Paragraph No. 21 of Plaintiff's Complaint.

22.

Defendants deny that Plaintiff issued a written demand for payment pursuant to O.C.G.A. § 33-4-6 on October 15, 2024 and denies that the exhibit marked as Exhibit "E" accurately depicts a demand letter dated October 15, 2024. For further response, Plaintiff issued a demand letter dated October 15, 2025 seeking payment in the amount of $103,469.61 after accounting for the Policy's 2% ($48,000) Wind and Hail Deductible. Defendants deny the remaining allegations as alleged in Paragraph No. 22 of Plaintiff's Complaint.

23.

Defendants admit that Mount Vernon issued multiple written correspondences in response to Plaintiff's demand, including on January 21, 2025 and December 15, 2025, setting forth Mount Vernon's coverage position and explaining that the loss does not trigger coverage under the Policy. Defendants specifically deny that Mount Vernon "refused to honor Plaintiff's claims" as alleged. Defendants deny the remaining allegations as alleged in Paragraph No. 23 of Plaintiff's Complaint.

24.

Defendants admit that Plaintiff issued a second demand on or about February 26, 2026, for $103,469.61. Defendants specifically deny the allegation that the "damage should have been covered under the terms of the Policy." Defendants deny the remaining allegations as alleged in Paragraph No. 24 of Plaintiff's Complaint.

25.

Defendants admit that Mount Vernon, through its counsel, responded to Plaintiff's second demand on April 3, 2026, again setting forth Mount Vernon's prior coverage position and explaining that the loss does not trigger coverage under the Policy.

**COUNT I – BREACH OF CONTRACT**

26.

Defendants incorporate their responses to Paragraph Nos. 1-25 of Plaintiff's Complaint as if fully stated herein.

27.

Defendants deny the allegations put forth in Paragraph No. 27 of Plaintiff's Complaint.

28.

Defendants deny the allegations put forth in Paragraph No. 28 of Plaintiff's Complaint, specifically the allegation that Mount Vernon is "required to compensate Plaintiff for all direct physical losses" as alleged. For further response, Defendants state that the Policy is the best evidence of its terms, conditions, limitations, and exclusions. Defendants deny the remaining allegations put forth in Paragraph No. 28 of Plaintiff's Complaint.

29.

Defendants deny the allegations put forth in Paragraph No. 29 of Plaintiff's Complaint.

30.

Defendants deny the allegations put forth in Paragraph No. 30 of Plaintiff's Complaint.

31.

Defendants deny the allegations put forth in Paragraph No. 31 of Plaintiff's Complaint.

**COUNT II – RECOVERY OF INTEREST UPON DAMAGES (O.C.G.A. § 13-6-13)**

32.

Defendants incorporate their responses to Paragraph Nos. 1-31 of Plaintiff's Complaint as if fully stated herein.

33.

Defendants deny the allegations put forth in Paragraph No. 33 of Plaintiff's Complaint. For further response, Plaintiff is barred from recovery under O.C.G.A. § 13-6-13 because O.C.G.A. § 33-4-6 provides the exclusive remedy for an insurer's failure to pay insurance benefits, and Plaintiff may not ignore the procedural requirements of § 33-4-6 in an attempt to recover under § 13-6-13.

**COUNT III – BAD FAITH DAMAGES AND ATTORNEY'S FEES (O.C.G.A. § 33-4-6)**

34.

Defendants incorporate their responses to Paragraph Nos. 1-33 of Plaintiff's Complaint as if fully stated herein.

35.

Defendants deny the allegations put forth in Paragraph No. 35 of Plaintiff's Complaint.

36.

Defendants deny the allegations put forth in Paragraph No. 36 of Plaintiff's Complaint.

37.

Paragraph No. 37 states a legal conclusion to which no response is required. To the extent

a response is required, Defendants deny the allegation that they were obligated to pay Plaintiff any amount under the Policy as Plaintiff's claimed damages were not covered under the Policy. Defendants deny the remaining allegations put forth in Paragraph No. 37 of Plaintiff's Complaint.

38.

Defendants deny the allegations put forth in Paragraph No. 38 of Plaintiff's Complaint.

**ATTORNEY'S FEES AND EXPENSES (O.C.G.A. § 13-6-11)**

39.

Defendants incorporate their responses to Paragraph Nos. 1-38 of Plaintiff's Complaint as if fully stated herein.

40.

Defendants deny the allegations put forth in Paragraph No. 40 of Plaintiff's Complaint. For further response, Plaintiff is barred from recovery under O.C.G.A. § 13-6-11 because O.C.G.A. § 33-4-6 provides the exclusive remedy for an insurer's failure to pay insurance benefits, and Plaintiff may not ignore the procedural requirements of § 33-4-6 in an attempt to recover under § 13-6-11.

41.

Defendants deny the allegations put forth in Paragraph No. 41 of Plaintiff's Complaint. For further response, Plaintiff is barred from recovery under O.C.G.A. § 13-6-11 because O.C.G.A. § 33-4-6 provides the exclusive remedy for an insurer's failure to pay insurance benefits, and Plaintiff may not ignore the procedural requirements of § 33-4-6 in an attempt to recover under § 13-6-11.

**PRAYER FOR RELIEF**

Defendants deny all allegations, to the extent that they exist, in the "WHEREFORE" paragraph, including subparts (a) through (g).

**GENERAL DENIAL**

Defendants deny each and every allegation, count, and prayer for relief contained in the Plaintiff's Complaint or any supplement or amendment thereto. Defendants further deny that any relief should be granted to the Plaintiff. Defendants further demand strict proof of each element of liability and damages in accordance with the standard of proof required by law.

**FIRST AFFIRMATIVE DEFENSE**

The Complaint fails to state a claim upon which relief can be granted against Defendants as the Property did not sustain physical loss or damage caused by a covered cause of loss occurring during the policy period. The Complaint should therefore be dismissed.

**SECOND AFFIRMATIVE DEFENSE**

Mount Vernon's obligations to its insured are governed by the Policy, and it incorporates the Policy's terms, conditions, and exclusions as if fully set forth herein.

**THIRD AFFIRMATIVE DEFENSE**

The Policy is void or the Plaintiff's claims are barred due to misrepresentation the Plaintiff made concerning the scope and amount of damage caused by the alleged wind loss.

**FOURTH AFFIRMATIVE DEFENSE**

The Policy insures against "direct physical loss or damage" occurring during the policy period by any cause of loss except those expressly excluded in the Policy. Policy, CP 00 10 06 07, p, 1 of 15. Plaintiff has failed to prove property damage caused by a covered cause of loss occurring during the policy period.

**FIFTH AFFIRMATIVE DEFENSE**

Plaintiff seeks damages that are excluded under the Policy, including, but not limited to, those damages caused by age-related deterioration, inadequate or faulty maintenance, and wear and tear. The Policy's Causes of Loss – Special Form contains the following exclusions:

**B. Exclusions**

***

**2.** We will not pay for loss or damage caused by or resulting from any of the following.

***

**d.** **(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

***

**(4)** Settling, cracking, shrinking or expansion;

***

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

***

**c.** Faulty, inadequate or defective:

***

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

Policy, CP 10 30 06 07, pp. 1-4 of 10. Mount Vernon's multiple inspections revealed existing damage in the Property's structure. Given this Policy language excluding coverage caused by wear and tear, deterioration, hidden defects, settling, expansion, as well as faulty, inadequate construction, renovation, or maintenance, coverage is unavailable for damage caused by age-related wear and tear and pre-existing damages.

**<u>SIXTH AFFIRMATIVE DEFENSE</u>**

Defendants allege as affirmative defenses all applicable terms, conditions, and exclusions in the Policy, including, but not limited to, provisions addressing policy deductibles and limitations on loss.

**<u>SEVENTH AFFIRMATIVE DEFENSE</u>**

Count II of Plaintiff's Complaint alleging Recovery of Interest Upon Damages under O.C.G.A. § 13-16-13 and claim for Attorney's Fees and Expenses sought under O.C.G.A. § 13-6-11 are subject to dismissal because O.C.G.A. § 33-4-6 is the exclusive remedy for an insurer's bad faith refusal to pay insurance proceeds. *See Howell v. S. Heritage Ins. Co.*, 214 Ga. App. 536, 536, 448 S.E.2d 275, 276 (1994); *see also Auto–Owners Insurance Company v. Hale Haven Properties, LLC*, 346 Ga. App. 39, 50, 815 S.E.2d 574, 585 (2018); *see also Balboa Life & Cas., LLC v. Home Builders Fin., Inc.*, 304 Ga. App. 478, 483, 697 S.E.2d 240, 245 (2010). Plaintiff is therefore barred from seeking to recover under O.C.G.A. § 13-6-11 or O.C.G.A. § 13-16-13.

**<u>EIGHTH AFFIRMATIVE DEFENSE</u>**

Count III of Plaintiff's Complaint alleging bad faith claims are barred as Plaintiff has failed to plead the requirements to prove bad faith denial as required by O.C.G.A. § 33-4-6.

**<u>NINTH AFFIRMATIVE DEFENSE</u>**

Plaintiff's allegations against Defendant United States Liability Insurance Company (again, "USLI") are subject to dismissal because USLI is not the insurer and did not issue the Policy to Plaintiff. Because Plaintiff was not in privity of contract with USLI, Plaintiff's claims against USLI fail as a matter of law.

**TENTH AFFIRMATIVE DEFENSE**

Defendants reserve the right to amend their Answer to include additional affirmative defenses as they become available.

**WHEREFORE,** Defendants pray for the following:

(a) that Plaintiff's claims against them be dismissed with prejudice;

(b) that all costs in this action be assessed against the Plaintiff; and

(c) for any other relief that the Court deems just and proper.

This 2nd day of July 2026.

**WOOD, SMITH, HENNING & BERMAN LLP**
1230 Peachtree Street NE, Suite 2350
Atlanta, Georgia 30309
Telephone: 470-552-1150
Fax: 470-552-1151
prowe@wshblaw.com
drobertson@wshblaw.com
pyoung@wshblaw.com

*/s/ P. Jeffery Rowe*
P. Jeffery Rowe
Georgia Bar No. 125728
Daniel P. Robertson
Georgia Bar No. 268918

*Counsel for Defendants*

**IN THE SUPERIOR COURT OF BUTTS COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| MASON PARK PROPERTIES, LLC ,<br><br>Plaintiff,<br><br>v.<br><br>MOUNT VERNON FIRE INSURANCE COMPANY, a foreign corporation, and UNITED STATES LIABILITY INSURANCE COMPANY, a Foreign Corporation,<br><br>Defendants. | CIVIL ACTION FILE NO.:<br><br>2026-SU-V-0228 |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing ***Defendants Mount Vernon Fire Insurance Company's and United States Liability Insurance Company's Answer and Affirmative Defenses*** on all parties, via PeachCourt as follows:

John T. O'Neal
David E. Penland
**Beck, Owen & Murray**
One Griffin Center – Suite 600
Griffin, Georgia 30223
joneal@beckowen.com

This 2nd day of July 2026.

**WOOD, SMITH, HENNING & BERMAN LLP**
1230 Peachtree Street NE, Suite 2350
Atlanta, Georgia 30309
Telephone: 470-552-1150
Fax: 470-552-1151
prowe@wshblaw.com
drobertson@wshblaw.com
pyoung@wshblaw.com

*/s/ P. Jeffery Rowe*
P. Jeffery Rowe
Georgia Bar No. 125728
Daniel P. Robertson
Georgia Bar No. 268918

*Counsel for Defendants*

**Pam Young**

**From:** PeachCourt Notifications <notifications@peachcourt.com>
**Sent:** Thursday, July 2, 2026 1:43 PM
**To:** Pam Young
**Subject:** PeachCourt Activity Case # 2026-SU-V-0228

The following filing was received by PeachCourt and has been successfully transmitted to the Clerk of Butts Superior Court. You will receive a separate confirmation message if this filing is accepted by the clerk. We invite you to reply to this message if you have any questions.

Submission Date: 7/2/2026 at 1:42 PM
Peach #: E-5QKXG5WW
Case #: 2026-SU-V-0228
Case Name: MASON PARK PROPERTIES, LLC V MOUNT VERNON FIRE INSURANCE COMPANY, A FOREIGN CORPORATION, ET AL

Documents

Answer: Defendants Mount Vernon Fire Insurance Company's and United States Liability Insurance Company's Answer and Affirmative Defenses
Defendants Mount Vernon Fire Insurance Company's and United States Liability Insurance Company's Answer and Affirmative Defenses.pdf

Filer: Pamela Young-Wynn

Payment amount: $62.40

eFiling Fee: $30.00
eFiling Fee: $30.00
Convenience Fee: $2.40

Thank you for filing with PeachCourt, Georgia's eFiling and Document Access Solution.